**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- X

ARCHIE COSEY,

                            Petitioner,

       -against-

LYNN LILLEY, Superintendent of Woodbourne
Correctional Facility

                         Defendants.

-------------------------------------------------------------------- X


## ADDENDUM STATING THE FACTUAL GROUNDS FOR ARCHIE COSEY'S PETITION FOR WRIT OF HABEAS CORPUS


BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, PH/26th Floor
New York, New York 10016
(212) 490-0400


*Pro Bono Attorneys for Petitioner*

## PRELIMINARY STATEMENT ON ISSUES AND GROUNDS FOR RELIEF

1.    Petitioner Archie Cosey's underlying charges involve a drug crew who worked out of 162 West 123rd Street in Manhattan and the August 3, 1993 shooting death of James Williams at that building. Petitioner asserts that he was illegally charged and convicted and that, as he told the Court at the time of his sentence, he was actually innocent of the charges brought against him. Petitioner further asserts *Brady* and Due Process violations for, *inter alia*, prosecutors' failure to disclose to plaintiff that a witness had perjured himself during grand jury proceedings, an *ex parte* letter ADA Luke Rattler sent to the trial judge, and ineffective assistance of counsel.

2.    Prosecutors alleged that petitioner participated with David Bobbitt, Christopher Ortiz, Danny Green and Carl Dushain in murdering James Williams in the front hallway on the second floor of the 162 West 123rd Street brownstone (the "building"). Prosecutors argued that, with Bobbitt acting as a lookout, petitioner and Dushain attacked and restrained Williams and that Green, at the direction of Dushain, shot Williams in the back. Petitioner asserts that the prosecution's version of the Williams shooting was fabricated and false in all respects: first because he was not at the building when Williams was shot; and second because Williams was not killed in the manner alleged by prosecutors, but was shot by people who came to the building seeking to retaliate for a shooting that took place near that location the previous day.

3.    Below, petitioner asserts several Due Process and *Brady* violations. First, ADA Rettler failed to advise the petitioner of Edward Walker's grand jury perjury. Walker had testified that he was present when Williams was shot, but in fact he had been incarcerated on that date. Walker's perjury created a spillover effect when Janet Hutchins, the only other witness putting petitioner at the scene of the Williams shooting, also testified that Walker had been present in the building when Williams was shot. Walker's false testimony materially impaired the grand jury

1

presentation and the resulting indictment. When ADA Rettler knew that Walker had lied about being present for the Williams shooting, he should have promptly advised defense counsel and the court and sought permission to resubmit. Walker's grand jury testimony was both exculpatory and impeachment evidence favorable to the defense and ADA Rettler had a prosecutorial obligation to disclose regardless of whether he intended to call Walker at trial.

4.      Petitioner also argues that his Due Process rights were violated when ADA Rettler submitted an *ex parte* letter to the Honorable Leslie Crocker Snyder, the trial judge. Because the letter to Judge Snyder was *ex parte*, ADA Rettler deprived petitioner of information which would have provided a firm basis to argue that the spillover effect of Walker's false grand jury testimony irreparably undermined reliance on his other testimony and on Janet Hutchens' grand jury testimony. This testimony prejudiced petitioner and his co-defendants and required dismissal of the indictment. Because petitioner did not know about the *ex parte* letter and the misrepresentations made to Judge Snyder, he was deprived of his right to contest the claim that he was the source of Walker's information about the Williams shooting and that he had told Walker that he had participated in the shooting. Petitioner should have been advised of Walker's false grand jury testimony before considering whether or not to plead guilty and the failure to advise him alone rendered his plea constitutionally defective.

5.      These *Brady* and Due Process violations were first discovered during petitioner's CPL § 440.10 hearing. Petitioner asserts that the Honorable Ruth Pickholz misapplied federal law in denying petitioner's CPL § 440.10 application, specifically as to petitioner's *Brady* and Due Process arguments.

6.      Petitioner further argues that his counsel was ineffective for: (1) failing to develop a defense and consult with experts regarding the trajectory of the bullet that killed James Williams;

(2) for failing to argue that petitioner was deprived of favorable testimony of David Bobbitt; and (3) for failing to pursue petitioner's efforts to withdraw his guilty plea prior to sentencing.

7.      As shown through affidavits and testimony from petitioner's CPL § 440.10 hearing, the prosecution's scenario about how Williams was killed in the building's front hallway is false because Williams died as a result of being shot in the back as he ran up the front steps of 162 West 123rd Street, trying to escape a hail of bullets that came from the opposite side of the street when several young men began shooting at the people in front of the building. The medical examiner found that the bullet that killed Williams had entered on the left side of his body, just below his hip and traveled in an upward motion, moving right, eventually logging in his neck. According to the testimony of Chris Ortiz from the trial of Green and Dushain, Williams was on his knees in the second-floor vestibule when he was shot. Under Ortiz's description of the Williams shooting, the gunman would have needed to be standing under Williams in the vestibule at the time he was shot in order for the bullet to take the trajectory described by the medical examiner. This scenario is practically impossible. A far more likely scenario, and one advanced by petitioner since 1993, is that Williams was shot as he was running up the stairs of 162 West 123rd Street, bending over in an attempt to avoid being shot by gunmen standing across the street.

8.      Additionally, forensic evidence contradicts prosecutors' theory of the case. Janet Hutchins testified at Green and Dushain's trial that Green fired a shot at Williams in the vestibule that missed him completely, yet detectives did not find any evidence of bullet holes in within the vestibule. Detectives did however note the lack of forensic evidence inside the vestibule where the shooting allegedly took place. There were no shells from the firing of any weapon, no evidence of a misfired gunshot, as alleged in Hutchens testimony, no indication that there had been a scuffle involving several people in the vestibule, and no evidence of anyone having been on their knees,

as Williams was alleged to have been at the time of the shooting.  The detectives also noted that there were no traces of blood in the area of the vestibule and that grime and dust were present, indicating no apparent signs of a cleanup.

9.      As stated in Bobbitt's affidavits and hearing testimony,[1] enclosed as Exhibits 1 and 2, neither petitioner nor Green were at the building at or around the time that Williams was shot. As shown by the Summers affidavit and hearing testimony, enclosed as Exhibit 3 and 4, petitioner was with her on the next block at the time of the shooting that caused Williams' death.  As shown by Anderson's affidavit and hearing testimony, enclosed as Exhibits 5 and 6, right after that shooting petitioner came running from his mother's home, on the next block to the west, towards the 162 West 123rd Street block.  As shown by petitioner's affidavit, enclosed as Exhibit 7, at the time of the shooting he was with Summers at 230 West 123rd Street a block away from 162 West 123rd Street. He then ran towards the building just after the shooting, met Ortiz and Dushain at the corner as they were helping the wounded Bobbitt get into a cab to go to the hospital, and then went to the building where he saw Williams lying at the second floor entrance. Petitioner later went to the hospital to check on Bobbitt, during which time he saw the ambulance attendants bringing Williams into the emergency room. As shown below, Herbie Bryant was on the front steps of the building close to Williams who was alive just before they both tried to escape from the bullets shot from across the street by running into the building through the front door at the top of the stairs – Bryant successfully, Williams unsuccessfully. As shown by Sarah Wallace's affidavit and hearing testimony, enclosed as Exhibit 8 and 9, Ortiz, who previously told investigators that petitioner was present when Williams was shot, told Ms. Wallace that petitioner is innocent.

---

[1] Petitioner has enclosed the cited portions of transcripts from the Green and Dushain trial as well as petitioner's CPL § 440.10 hearing. Upon request from the Court, petitioner will provide additional excerpts or complete copies of any exhibits referenced herein.

10.     For the foregoing reasons and the evidence provided below, petitioner has met his burden of showing that his guilty plea is constitutionally void because of *Brady* and Due Process violations and that he is actually innocent of the Williams murder. Thus, petitioner should be released from custody or granted a new trial on all criminal charges.

## JURISDICTION AND VENUE

11.     Petitioner is currently detained by the New York State Department of Corrections and Community Supervision at Woodbourne Correctional Facility, 99 Prison Road, Woodbourne, New York.

12.     The incident giving rise to this petition occurred in New York, New York. Petitioner pleaded guilty to the crimes described herein in New York Supreme Court, New York County.

13.     This Court has jurisdiction over this petition for writ of Habeas Corpus pursuant to 28 U.S.C §§ 1331 and 2254.

## PROCEDURAL HISTORY

*Petitioner's Guilty Plea, State Court Appeals, and First Petition for Habeas Corpus*

14.     Although the events in question took place on August 3, 1993, petitioner and his co-defendants were not indicted, upon information and belief, until shortly before their arrests in or around October 1997. Petitioner, Green and Ortiz were arrested in 1993 for the Williams shooting shortly after it occurred, but, upon information and belief, were released when Bobbitt appeared on crutches at their arraignment and explained to the Court how he was shot in front of 162 West 123rd Street, at the same time Williams was shot, by the men firing at the building from across the street.  Upon information and belief, the criminal charges were subsequently withdrawn by prosecutors. Petitioner was again arrested for the Williams murder on October 14, 1997. The

indictments of petitioner, Green and Dushain, *inter alia*, charged them with Conspiracy in the First and Second Degrees (drug dealing charges), Murder in the Second Degree as to Williams, and Kidnaping in the Second Degree.

15.    On October 15, 1998, petitioner appeared with his attorney, D. Andrew Marshall, before the Honorable Leslie Crocker Snyder in Part 88 of New York Supreme Court, New York County, and pleaded guilty to one count of Conspiracy in the First Degree (for the sale of narcotics) and one count of Murder in the Second Degree (for the homicide of James Williams). His plea was in exchange for the Court's promise to sentence him to concurrent indeterminate prison terms of twenty-five years to life. *See* Exhibit 10, Plea Minutes at 66. Bobbitt pled guilty in a separate proceeding.

16.    On November 10, 1998, petitioner appeared with his attorney before Judge Snyder and submitted a *pro se* letter motion seeking to withdraw his plea, asserting innocence, coercion and ineffectiveness of counsel. *See* Exhibit 11, Sentencing Minutes at 81-84. In particular, petitioner alleged that his attorney had deceived him by falsely promising that he would not have to plead guilty to a violent felony and that his co-defendants' attorneys pressured him to take whatever plea was offered so that his co-defendants could get reduced sentences. Petitioner alleged that a person communicating for a co-defendant had threatened to kill his child and his child's mother (Yolanda Summers) if he did not plead guilty. The Court, emphasizing petitioner's plea allocution and failure to report any threats to either his attorney or the District Attorney, held that petitioner had entered his plea knowingly and voluntarily. Petitioner's lawyer read his letter-motion into the record, but made no effort to make a supporting argument. Instead, petitioner's counsel acquiesced to the Court's comments about the previous proceedings that led to the plea,

as if there was no merit to petitioner's challenge. The Court denied petitioner's motion without an evidentiary hearing as to his allegations and proceeded to sentence him to twenty-five years to life.

17.    At Greene and Dushain's trial that began in mid-November 1998, Ortiz and Hutchens testified in support of the prosecution's version of the facts, that Williams was executed in the building hallway. Greene and Dushain were convicted of murder and other charges.

18.    On September 27, 2001, the Appellate Division, First Department, unanimously affirmed petitioner's conviction, *People v. Cosey*, 286 AD2d 647, 730 NYS2d 434 (1st  Dept 2001), *lv denied* 97 N.Y.2d 655, 737 N.Y.S.2d 56 (2001), holding that the trial court had not abused its discretion in denying his motion to withdraw his plea without conducting an evidentiary hearing.  See Appellate Division decision enclosed as Exhibit 12.

19.    On August 6, 2002, petitioner filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in the United States District Court, Southern District of New York. Petitioner alleged that the trial court had abused its discretion by denying his motion to withdraw his guilty plea without conducting an evidentiary hearing.  The April 8, 2003 Opinion and Order of the Honorable Shira A. Scheindlin denied the petition, holding that he failed to raise any constitutional claim in his petition and, assuming that he had raised a due process claim, that such claim would be insufficient because the trial court's decision was neither "contrary to, nor did it involve an unreasonable application of clearly established federal law as established by the [United States] Supreme Court." *Cosey v. Walsh*, 02 Civ 6251, 2003 U.S. Dist. LEXIS 5644, at * 8 (S.D.N.Y. Apr. 7, 2003). Enclosed here as Exhibit 13.

***CPL § 440.10 Motion Raising the Instant Claims***

20.     Petitioner filed a CPL § 440.10 motion in New York Supreme Court, New York County on or about October 20, 2011, raising claims of actual innocence, *Brady* and Due Process violations, and ineffective assistance of counsel.

21.     The Honorable Ruth Pickholz granted a hearing on petitioner's CPL § 440.10 motion, which his co-defendants subsequently joined.

22.     From July 2014 through May 2015, the Court heard testimony regarding petitioner's claims, as well as the claims of his co-defendants.

23.     At a hearing on January 12, 2017, Judge Pickholz delivered her Order and Opinion on the CPL § 440.10 motion, vacating the murder conviction of Dushain and Green on ineffectiveness and *Brady* grounds. Petitioner's application was denied in its entirety. *See*, *People v. Cosey*, 54 Misc. 3d 1208 (A); 52 N.Y.S.3d 247; 2016 N.Y. Misc. LEXIS 4896; 2016 NY Slip Op 51853(U). Decision enclosed as Exhibit 14. Upon information and belief, Green and Dushain were not retried on the murder charges.

24.     Petitioner appealed Judge Pickholz's decision to the Appellate Division, First Department. Petitioner's appeal was denied on September 19, 2017. Enclosed herein as Exhibit 15.

25.     Petitioner appealed the First Department's denial to the Court of Appeals. Petitioner's appeal to the Court of Appeals was denied on December 4, 2017. Enclosed herein as Exhibit 16.

## EVIDENCE SUPPORTING RELIEF REQUESTED

### I.     PETITIONER'S *BRADY* AND DUE PROCESS RIGHTS WERE VIOLATED

26.     Petitioner's plea was constitutionally deficient for a number of reasons. First, petitioner was not informed of Edward Walker's grand jury perjury prior to entering his guilty

plea. Second, petitioner was not advised that ADA Rettler's *ex parte* letter improperly informed Judge Snyder that, according to Walker, petitioner told him about the Williams shooting and admitted having participated – a prejudicial due process/fair trial violation as well as circumstances which would have supported a recusal motion so that the plea should never have proceeded before Judge Snyder. Pursuant to *Brady* and its progeny,[2] petitioner was entitled to the disclosure of the newly discovered information about Walker's perjury prior to the entry of his guilty plea. The withholding of that information alone made his plea constitutionally defective. It is fundamental that "the government's obligation under *Brady* is pertinent not only to an accused's preparation for trial, but also his determination of whether or not to plead guilty." *United States v. Avelino*, 136 F. 3d 249, 255 (2d Cir. 1998). Finally, petitioner's trial counsel was ineffective in, *inter alia*, not pursuing efforts to support Petitioner's pre-sentence application to vacate his plea due to having been improperly deprived of Walker's testimony.

***Prosecutors Withheld Prejudicial Grand Jury Testimony***

**New York City Police Department Detective Daley**

27.     During the trial of Green and Dushain, ADA Rettler called NYPD Detective Daley to testify about his investigation into the Williams murder. Despite the fact that the DD5 Detective Daley completed and signed on August 4, 1993, enclosed as Exhibit 22, noted that there were no signs of ballistics or forensic evidence consistent with a struggle or a shooting in the 162 West 123rd Street hallway, and that there were no signs of a cleanup, he testified before the grand jury in 1997:

> [W]e went back to [162 West 123rd Street] and I noticed there was a broken hole in the glass of the top window of West 162 entrance on the left hand side we went in to the hallway to see if we could find a shell casing from that bullet in the

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Bagley*, 474 U.S. 667 (1955); *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Agurs*, 427 U.S 97 (1976); and *Kyles v. Whitely*, 514 U.S. 419 (1994).

> hallway. It appeared to have been swept, the dust on the floor having streaks in it
> we were not able to find any shell casing at the scene the next day.

Exhibit 25, Rettler Hearing Testimony at 1119 (reading of Daley's grand jury testimony into the record at petitioner's CPL § 440.10 hearing). Rettler did not correct the witness, despite the fact that his grand jury testimony was starkly different from his August 4, 1993 DD5. *See* Exhibit 22, DD5 Signed by Detective Daley. Additionally, according to Chris Ortiz's testimony at the trial of Dushain and Green, the hole in the glass was present before Williams was allegedly shot, as Dushain called him and petitioner into 162 West 123rd Street through that hole. Exhibit 26, Chris Ortiz Trial Testimony at p. 418. When ADA Rettler knew that Daley's testimony was inconsistent with his August 4, 1993 DD5, he should have made the inconsistency known to Daley, the grand jury, defense counsel, and the Court.

### Prosecution's Grand Jury Witness Edward Walker

28.     Edward Walker's false testimony materially impaired the grand jury presentation and the resulting indictment. When ADA Rettler knew that Walker had lied about being present for the Williams shooting, he should have promptly advised defense counsel and the court and sought permission to resubmit.

29.     Although the prosecution had confronted Walker on October 24, 1997 regarding his having actually been incarcerated on August 3, 1993, they waited almost eight months before making the application to Judge Snyder. During this time the prosecution proceeded to indict Walker for perjury and obtained his guilty plea and sentence, all while keeping secret from the defense that Walker had falsely testified in the grand jury. The prosecution thereby prevented any timely investigation defense counsel could have conducted and any application regarding the fundamentally impaired grand jury proceeding they should have made to the Court.

30.     In the Voluntary Disclosure Form ("VDF") prosecutors provided Walker's defense attorney, it is reported that, in reference to his false grand jury testimony, Walker told ADA Retter "You know I wasn't there. I made it up. I wanted to help myself. It just snowballed. That's exactly what happened because I heard it from everybody else. I can't believe I did this. I really fucked up." Ex. 24, Voluntary Disclosure Form.

31.     Walker's grand jury testimony was both exculpatory and impeachment evidence favorable to the defense and ADA Rettler had a prosecutorial obligation to disclose regardless of whether he intended to call Walker at trial. ADA Rettler's conduct violated *Kyles v. Whitley*, 514 U.S. 419 (1995), where the Supreme Court held that, under *Brady*, there is no exception to the prosecutor's requirement to disclose exculpatory or impeachment evidence, even if the prosecutor does not intend to call a witness.

***Prosecutors' Ex Parte Communication with the Court Regarding the Prejudicial Grand Jury Testimony Violated Petitioner's Due Process Rights***

32.     On October 24, 1997, nearly one year before petitioner pled guilty to conspiracy in the first degree and murder in the second degree and eight months before ADA Rettler's *ex parte* letter to Judge Snyder, Walker was prosecuted for perjury.

33.     Petitioner emphasizes, without limitation, that ADA Rettler's detailed June 8, 1998 *ex parte* letter to Judge Snyder failed to advise her of the most significant fact regarding Walker's perjury, that when Hutchins testified at the grand jury, which was after Walker, she said that Walker had been present at the alleged hallway shooting scene. Because the letter to Judge Snyder was *ex parte*, ADA Rettler deprived petitioner of information which would have provided a firm basis to argue that the spillover effect of Walker's false grand jury testimony about the Williams shooting irreparably undermined reliance on his other testimony and on Janet Hutchens' grand jury testimony about the drug dealing conspiracy. This testimony prejudiced the defendants and

11

required dismissal of the indictment. The prosecution's scenario of the Williams shooting and petitioner's involvement in the drug trade were first presented to the grand jury through Walker's testimony.[3]

34.    ADA Rettler's *ex parte* letter to Judge Snyder unfairly violated petitioner's due process rights by making statements that were greatly prejudicial. *See e.g.*, "Walker informed the People that Cosey had told him what had happened that night concerning the murder of Williams." Exhibit 27 *Ex Parte* Letter from ADA Rettler to Judge Snyder; "While [Walker] falsely testified in the grand jury that he witnessed the murder of Williams, in fact he became aware of the facts of that murder based on admissions by Cosey." *Id*.; and "…after all, such disclosure would compel the inference that the witness in questions [sic], albeit not a true eyewitness, had sufficient information about the homicide to be able to pass himself off as such to the police, district attorney and grand jury. Because of the information Walker received from Cosey, he falls obviously into this category, and would likely be suspected by the Dushain organization for this reason alone . . ." *Id*.

35.    Because petitioner did not know about the *ex parte* letter and the misrepresentations made to Judge Snyder, he was deprived of his right to contest the claim that he was the source of Walker's information about the Williams shooting and that he had told Walker that he had participated in the shooting. If properly informed, petitioner would have had a firm basis, in connection with motions contending insufficiency of grand jury evidence or otherwise, to persuasively attack the good faith and integrity of ADA Rettler's *ex parte* application.

---

[3] Before Walker testified there were only two grand jury references to petitioner (subject to court review of redacted testimony pages); Detective Daley identified petitioner by photo as a member of the Yellow Crack Gang and cooperating witness Lester Roulach identified petitioner as Carl Dushain's partner when Dushain first started, who was later removed from leadership.

36.     ADA Rettler's *ex parte* letter to Judge Snyder irreparably prejudiced petitioner's efforts to withdraw his guilty plea. At petitioner's sentencing, Judge Snyder made a series of very disparaging comments about his allegedly untruthful and manipulative claims and conduct without either the Judge or ADA Rettler carrying out their obligations to disclose that it had been represented to the Judge *ex parte* that petitioner had told Walker that he participated in the Williams killing and gave Walker information about how it happened. At petitioner's sentencing, Judge Snyder made numerous negative comments, specifically relying on information obtained in the *ex parte* letter. *See e.g.* "The evidence against you both in the Grand Jury minutes *and other sources* is overwhelming. I think what you are doing now is lying. I reject what you have to say." (emphasis added) (Exhibit 11, Cosey Sentencing Minutes at 89); In retrospect, the "other sources" surely referred to the statements made in ADA Rettler's *ex parte* letter about what petitioner allegedly told Walker.

***Judge Pickholz Misapplied Federal Law in Denying Petitioner's Brady and Due Process Claims***

37.     Judge Pickholz's Order and Opinion recognized that a *Brady* violation occurred in this matter and, as a result, vacated Green's and Dushain's murder counts. Exhibit 14 at 44. However, she held that because petitioner pleaded guilty before the trial of Green and Dushain, the People were not "obligated to disclose the perjury to him prior to his plea." *Id*. Notwithstanding the fact that petitioner pled guilty during jury selection, Judge Pickholz's decision is contrary to federal law. *See*, *Miller v. Angliker*, 848 F.2d 1312, 1320 ("[W]e conclude that even a guilty plea that was 'knowing' and 'intelligent' may be vulnerable to challenge if it was entered without knowledge of material evidence withheld by the prosecution.").

38.     Judge Pickholz found Walker's grand jury testimony to be material. Exhibit 14, Pickholz Order and Opinion at 43-44. Further, Judge Pickholz found that "Walker's perjury did

not exculpate the defendants, but was only important insofar as it gave reason to discredit Hutchens, the People were not required to disclose it prior to calling Hutchens to the witness stand." *Id*. at 45. However this ignores the fact that the United States Supreme "Court disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes, and . . . *Bagley* held that regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v.* Whitley, 514 U.S. 419, 433-34 (1995) (citing *United States v. Bagley*, 473 U.S. 667, 685 (White J. concurring in part and concurring in judgment)). Here, petitioner would not have pleaded guilty if he would have had access to Walker's grand jury testimony.

### Prosecutors Prevented a Favorable Witness from Testifying on Petitioner's Behalf

39.    After initially agreeing to testify on petitioner's behalf, Bobbitt informed petitioner's counsel that he would not be able to testify. At petitioner's CPL § 440.10 hearing, Bobbitt testified "That's when like I said when they started playing games with my sentencing and I started feeling intimidated; and that I wasn't going to be guaranteed a reasonable sentence. At that point that's when I pulled back." Exhibit 2, Bobbitt Hearing Testimony at 327. At this point, Bobbitt told petitioner and his attorney that he couldn't testify. *Id*. Bobbitt's attorney informed him at his sentencing that his lawyer and the DA had established that he was going to plead the Fifth Amendment as to the James Williams incident, and that it would be in Bobbitt's best interest not to say anything about the August 3rd shooting.

40.    Bobbitt testified at petitioner's CPL § 440.10 hearing that he felt that if he came forward to testify in favor of petitioner he may be facing a possible life sentence for "telling the truth about what happened." Exhibit 2, Bobbitt Hearing Testimony at 312. Bobbitt further testified

14

"I had to plead the Fifth Amendment [at his *Evangelista* hearing] as part of the plea bargain. I had to plead the Fifth Amendment as part of the plea bargaining to the two 9 to 18's running concurrent." *Id*. at 314. It was Bobbitt's belief that if he testified on behalf of the others at trial as to what happened at 162 West 123rd Street on August 3, 1993, he "was going to be facing a very steep sentence and . . . might possibly be forced to trial." *Id*. at 318.

***Petitioner's Attorney was Ineffective for Failing to Develop a Defense and Consult with Experts Regarding the Bullet Trajectory, for Failing to Argue Petitioner Was Deprived of Favorable Testimony, and for Failing to Pursue Petitioner's Efforts to Withdraw His Guilty Plea***

41.    Petitioner's attorney failed to recognize the need to develop a defense based on the path of the bullet through Williams' body. This failure allowed the prosecution's version of Williams' murder, that he was shot while on his hands and knees in the vestibule of 162 West 123rd Street, to go unchecked. The crucial conflict between the bullet's path and the prosecution's claim as to how Williams was shot should have been apparent simply from reading the ME's report. Exhibit 20, Medical Examiner's Report. The need to develop the issues for the defense and consult with and obtain an expert witness should not have been overlooked by competent defense counsel. Petitioner's attorney testified that he failed to recognize these issues and made no effort to consult with experts. *See* Exhibit 28, Marshall Hearing Testimony at 1801-02.

42.    Petitioner's attorney was also ineffective for failing to argue that petitioner was deprived of Bobbitt's testimony. (See ¶ 39-40). Petitioner's attorney made no effort to learn in what way the DA had interfered with Bobbitt testifying on Cosey's behalf. Petitioner's counsel had an obligation to research this issue and determine that the district attorney could not interfere with Bobbitt's favorable testimony for petitioner. Any competent defense attorney would have recognized his obligation to make inquires and attempted to reverse the circumstances where the DA had improperly caused a favorable witness to become unavailable. However, the failure to

15

investigate Bobbitt's unwillingness to testify on behalf of petitioner resulted in the erroneous belief that Bobbitt would have lost his plea deal if he testified favorably for petitioner at trial. Indeed, Bobbitt testified that if he had "been informed that since you are now a sentenced prisoner and your case is over that you could testify" he would have done so. Exhibit 2, Bobbitt Hearing Testimony at p. 319.

43.     Petitioner's counsel was further ineffective regarding petitioner's effort to withdraw his guilty plea. Petitioner's counsel should have consulted with petitioner and tried to develop a strategy to support his claims that he was innocent and had made a mistake in pleading guilty.

44.     Petitioner's counsel should have advocated effectively for his client and not so meekly acquiesced to the judge's strongly expressed opinions at the sentence hearing. He should also have brought to the Court's attention that although petitioner ultimately gave all the required "yes" and positive responses when questioned at the plea by the Court and the District Attorney, his initial responses were inadequate and indicated that he was not admitting his guilt. *See e.g.*, "I might as well take [the plea offer]." Exhibit 10, Cosey Plea Minutes at p. 67; The murder "supposedly on 123rd Street." *Id*. at 72; and "I'm innocent/I'm innocent, Your Honor." Exhibit 11, Cosey Sentencing Minutes at 90. These remarks should have been a red flag to petitioner's attorney. That flag should have been raised higher when, in responding to whether he had spent much time discussing the plea with his attorney, petitioner initially said "No."  *Id*. at 68. Petitioner's counsel was more than arguably ineffective because he apparently made no effort to discuss with petitioner his assertions as to why he felt he was improperly pressured to plead guilty although he was innocent, and, at the very least, he should have tried to obtain an adjournment to investigate the specifics of petitioner's allegations, instead of allowing him to plead guilty.

45.     Finally, at petitioner's CPL § 440.10 hearing, Judge Pickholz went out of her way

to put her personal experience with petitioner's trial counsel on the record:

> I actually had Mr. Marshall in front of me on several occasions. I had him in front
> of me during a trial and I just want to disclose that at one point his representation
> in front of me I contacted the 18-b panel because I felt that he was not effective as
> a counsel . . . I was very adamant that I did not believe Mr. Marshall should be on
> the 18-b panel defending indigents who were accused of crimes. I was very adamant
> about that in one particular case that he appeared before me, so I made my feelings
> known very vocally.

*See* Exhibit 28, Marshall Hearing Testimony at 1804.

46.     Judge Pickholz vacated Green's and Dushain's murder convictions based on

ineffective assistance of counsel because their attorneys failed to consult with and call a forensic

medical expert, but Judge Pickholz denied petitioner's application on this ground, "as he did not

go to trial." Exhibit 14, Pickholz Order and Opinion at 49. This conclusion ignores the fact that

petitioner's plea came during jury selection and petitioner's counsel showed no intention of

consulting with a forensic medical expert prior to petitioner's guilty plea. *See* Exhibit 28, Marshall

Hearing Testimony at 1768. It is thus reasonable to conclude that if petitioner had not pleaded

guilty and instead went to trial, his counsel, like the counsel for his co-defendants, would have

been found ineffective.

## II.     PETITIONER IS ACTUALLY INNOCENT OF WILLIAMS MURDER BECAUSE HE WAS NOT PRESENT AT THE TIME OF THE SHOOTING

47.     Prior to petitioner's CPL § 440.10 hearing, three witnesses, Janet Hutchens, Herbie

Bryant,[4] and Chris Ortiz were independently contacted and questioned for the first time since the

---

[4] Myron Beldock, petitioner's original counsel at his CPL § 440.10 hearing, sadly passed away in 2016. While Herbie
Bryant was not called as a witness at the hearing, Mr. Beldock made detailed notes of a phone call with Mr. Bryant
regarding the events of August 3, 1993. The memo that Mr. Beldock wrote following that phone call is attached as
Exhibit 17.

1998 trial about the Williams shooting. They all volunteered to petitioner's attorney, Myron

Beldock, that petitioner was not present when Williams was shot. *See* Exhibits 8, 17, and 19.

48.     While Hutchens told prosecutors that petitioner was present when Williams was

shot, she had credibility issues, as she was addicted to crack cocaine at the time. Exhibit 25, Rettler

Hearing Testimony, p. 947. A DD5 from the 1993 investigation into Williams murder stated that

the murder charges against Green were dropped because Hutchens's credibility was tainted. *Id*. at

1111. Even ADA Rettler acknowledged Hutchens's credibility issues. *See, id*. at 1424, Rettler's

testimony that Hutchens was a "crack addict at or around the time of the events" and this fact might

have provided credibility issues. *See also*, Exhibit 18, Cosey Charging Form and DA Data Sheet,

noting that prosecutors were told Janet Hutchens "is a crack addict."

49.     Hutchens later testified that she told investigators that petitioner was present when

Williams was murdered because she was mad at him. "Archie had put me in the basement,

handcuffed me in basement and I got bitten up by all kinds of rats and all kinds of mosquitos and

everything so I was just being mean and I was getting back at him." *See*, Exhibit 19, Hutchens

Hearing Testimony at 1206, 1208. She also said "Archie wasn't there, it was Carl Dushain, Danny

Green, Chris Ortiz, and James Williams" *Id*. at 1258.

50.     The CPL § 440.10 hearing testimony of petitioner, Donald Anderson, and Yolanda

Summers also confirm that petitioner was not present at the time of the Williams shooting.

Anderson, a disinterested witness, who was on parole while he testified at petitioner's CPL §

440.10 hearing knew of the adverse consequences of providing false testimony. Nevertheless,

Anderson testified that after the shooting took place, he saw petitioner running east on 123rd Street,

from 8th Avenue toward the shooting. When asked how he knew petitioner didn't do the shooting,

Anderson testified that petitioner was not "present when the boys were shooting," that he was then

"Across the avenue, Seventh Avenue," and that his reaction to learning that petitioner had been arrested for the events surrounding the shooting was "I mean that Archie wasn't there when the shooting took place. That's it." *See*, Exhibit 6, Anderson Hearing Testimony at 559.

*51.*   The testimonies of petitioner and Summers further support petitioner's actual innocence. Both testified that petitioner and Summers were on the stoop of petitioner's mother's house, a block away from 162 West 123rd Street, at the time they heard gunshots. Only after the shots had been fired did petitioner run toward 162 West 123rd Street. *See* Exhibit 2, Bobbitt Hearing Testimony at p. 294.

52.   The only remaining witness who provided statements implicating petitioner also recanted his account of petitioner being at the scene of the shooting when interviewed by investigative reporter Sarah Wallace.

> Q:      . . . please tell us what you said and what [Ortiz] said?
>
> A:      I introduced myself. I identified myself. I told him that I was investigating the Archie Cosey case and the 1993 shooting in Harlem and I was wondering if he could tell me what he remembered about that shooting.
>
> Q:      And he said?
>
> A:      He said, well, Archie wasn't there.
>
> Q:      And you said?
>
> A:      I said Archie wasn't there? And he said no, he came running from the opposite direction to help.

Exhibit 9, Wallace Hearing Testimony at 1473. Ortiz's remembrance of the events at and after the shooting are consistent with the testimony of petitioner, Anderson, and Summers.

53.   The credibility of the statement Ortiz provided the police during their investigation which implicated petitioner is further undermined by the fact that Ortiz was not called at

petitioner's CPL § 440.10 hearing and that he received a reduced sentence for the crimes to which he pleaded guilty.

### *Summary of Archie Cosey's Affidavit and CPL § 440.10 Hearing Testimony*

54.    In his affidavit sworn to on November 29, 2018, enclosed as Ex. 7, petitioner asserts and details his absolute innocence of the Williams murder. Petitioner explains that on the afternoon of August 3, 1993, at a time when he was on the block, he learned from a female acquaintance that persons associated with an individual named Dido or Dino, who was shot and killed on the same block the day before, intended to come to shoot up the block that day in retaliation.  As a result, he stayed away from 162 West 123rd Street and the block where that building was located.  When the young men came around the corner and shot up the block, petitioner was on the next block in front of 230 West 123rd Street between 7th and 8th Avenue.  After he heard the shooting, he left his mother's house and ran towards 162 West 123rd Street. However, before getting there he found Dushain and Ortiz helping Bobbitt, who had been shot. They all helped get Bobbitt into a cab to the hospital, with Ortiz accompanying Bobbitt.  After loading Bobbitt into the cab, petitioner went to 162 West 123rd Street, with Dushain where they found Williams lying inside the front door at the top of the outside stairs foaming at the mouth.  As petitioner explains, when he and Dushain directly after going to the building, they learned Williams supposedly died of a heart attack.  (It was initially thought and reported by medical personnel that Williams had a heart attack and it was not discovered until afterwards, purportedly the next day, that he had a bullet wound in his back.). *See also*, Exhibit 29, Cosey Hearing Testimony at 529-39.

### *Summary of Yolanda Summers' Affidavits and CPL § 440.10 Hearing Testimony*

55.    In Yolanda Yvette Summers' handwritten affidavit sworn to on August 3, 2011, Exhibit 3, she explains that she was with petitioner and her brother Ernest on the stoop of 230 West

123rd Street between, 7th and 8th Avenues, on August 3, 1993, when they heard the sound of the shooting on the next block. She and Archie were smoking a cigarette and Archie was drinking a beer, while Archie's mother, Rebecca Bauldrick, was looking down at them from an upstairs window. When the sounds, which were "like firecrackers," went off, petitioner got up and went down the block towards the shooting. Before he did so, he expressed concern that his brother might have been on the block where the shots were fired. Before petitioner left, Summers saw three guys running past them very fast headed towards 8th Avenue. Petitioner then told her to go upstairs with his mother and he left, running towards 7th Avenue. She testified in further detail at petitioner's CPR § 440.10 hearing. *See* Exhibit 4, Summers Hearing Testimony at 222-24, 226-28.

56.     Summers continued that when petitioner came back after a few hours, he was very upset that his friend Bobbitt had gotten shot. He told her that he had helped get Bobbitt into a cab, along with another friend, Chris Ortiz.  He also said that another person had a heart attack – thus referring, without naming him, to what petitioner had been advised about Williams at the hospital. *See*, ¶ 54 and Exhibit 4, Summers Hearing Testimony at 226.

57.     In her other affidavit, undated but mailed to petitioner's counsel in May, 2011, Summers confirms that she advised petitioner of the communication made to her by someone purporting to speak for one of his co-defendants during which a threat was made that "he better not flip on niggas, or me and my kids would not live to see him again."[5] Exhibit 3, Summers Affidavit (dated mailing envelope attached).

### Summary of David Bobbitt's Affidavits and CPL § 440.10 Hearing Testimony

58.     Bobbitt swore in his affidavit that petitioner "was not at, in or around the location of when and where I and Mr. Williams were shot." Exhibit 1, Bobbitt Affidavit. In Bobbitt's

---

[5] That conversation presumably was the one petitioner discussed when he tried to withdraw his plea at the time of his November 10, 1998 sentencing.  *See* ¶ 16 *supra.*

second affidavit, Exhibit 1, sworn to on September 3, 2010, he reiterated that "the persons present at the time of the shooting were myself, Carl Dushain, James Williams and 'Herbie,' [Bryant] and that Chris Ortiz came to the front of the building right after the shooting." He added that "Danny Green was not present either before or after the shooting" and that he "did not see him that day at all."

59.     The affidavits and CPL § 440.10 hearing transcript of David Bobbitt, enclosed here as Exhibits 1 and 2, contain detailed evidence and information of petitioner's actual innocence and of the false scenario presented by the prosecution as to how Williams was shot and killed.  This information was not available to petitioner at the time he pleaded guilty. *See* Exhibit 1, Bobbitt Affidavit, Exhibit 2 Bobbitt Hearing Testimony at 294, 312, 314, 318, 319, 327, and ¶¶ 39-40. Bobbitt was advised that the prosecution would not approve his plea deal if he were to agree to testify as to how Williams was actually shot; consequently, he asserted his Fifth Amendment rights not to incriminate himself in regard to that potential testimony. *Id*. at 313-314. Thus, at the time of petitioner's CPL § 440.10 hearing, Bobbitt's information qualified as newly discovered evidence which could not have, with due diligence, been obtained by petitioner at the time of his plea.

60.     In Bobbitt's January 25, 2008 affidavit, he provides information about what happened on the night of August 3, 1993 at the time that he was shot and wounded, and Williams was shot and killed. *See* Exhibit 1, Bobbitt Affidavit. He explains that petitioner was not and could not have been involved in the shooting of Williams because petitioner was not at the building then or on that day.  Bobbitt was sitting on a milk crate in front of the lower step of the outside stairway to the building. Dushain and Bryant were also sitting with him.  At that time, Williams, "The Carpenter," was "at the top of the stairway, standing in the doorway to the 2nd floor entrance" of 162 West 123rd Street.  Bobbitt saw three young light-skinned black men walking on the opposite

side of 123rd Street from 7th Avenue toward Lenox Avenue. Asked about them, Dushain and Bryant said they didn't recognize any of them.  He saw one of them reach inside of a knapsack and pull a gun out and saw that the other two men had two smaller pistols. As "numerous shots were fired at us," Bobbitt, Dushain, and Bryant ran in different directions. Dushain ran to his right, towards the entrance of the abandoned building next door.  Bryant ran up the steps of 162 West 123rd Street, towards the second floor entrance.  Bobbitt ran to his left towards the lower-level entrance to the first floor apartment and threw himself flat down on his stomach: he heard shots continuously; some bullets hit just above him; and he began to feel sharp pains on his side, near his hip.[6]  It turned out that he had been shot and had to hold on to the metal front door and the wall to support himself as he entered the first floor apartment at the ground floor level. He was bleeding and yelling for help.  Dushain came and helped him up the stairway inside the building to the second floor hallway and over towards the second floor front door entrance landing. It was there that he "then saw James Williams laying on his stomach just inside the building at the second floor doorway, shaking, with foam coming out of his mouth." Dushain carried Bobbitt over Williams' body and down the front steps onto the street. Ortiz came running from the direction of Lenox Avenue and assisted Dushain in carrying Bobbitt to the corner of 7th Avenue and 123rd Street.

61.     At the intersection of 7th Avenue and West 123rd Street, Bobbitt first noticed petitioner coming towards him, running eastbound on West 123rd Street. Petitioner assisted Dushain and Ortiz in helping Bobbitt into a cab. Ortiz got into the cab to drive with Bobbitt to the Harlem Hospital emergency room. While Bobbitt was lying on a table in the emergency room, he saw some hospital personnel rushing Williams into the room and then into another room, out of his sight.

---

[6] *See* Exhibit 23, photographs of 162 West 123rd Street.

***Summary of Donald Anderson's Affidavits and CPL § 440.10 Hearing Testimony***

62.     In his affidavit and CPL § 440.10 hearing testimony, Donald Anderson explains that he was on the building stoops of townhouses at 168 and 170 West 123rd Street, the first address on August 2nd and second on August 3, 1993, when he witnessed the two shootings: the August 2nd shooting of Dido by Chubby in front of 160 West 123rd Street and the August 3rd shooting by what he remembered being two young brown-skinned men who came around the corner from 7th Avenue. *See* Exhibit 5, Anderson Affidavit and Exhibit 6, Anderson Hearing Testimony at 127-128, 138-139. Anderson describes the men having walked down the opposite side of the block until they were approximately opposite 160 West 123rd Street, when they came out with guns and started shooting across the street in the direction of 160 and 162. *See* Exhibit 6, Anderson Hearing Testimony at 138-139; 141-143. Mr. Anderson's affidavit is most significant in that on August 3, 1993, after the men had stopped shooting across the street, he saw petitioner coming from the opposite direction crossing 7th Avenue and running down 123rd Street in the direction of the shooting. Exhibit 5, Anderson Affidavit and Exhibit 6, Anderson Hearing Testimony at 559. This affidavit confirms both petitioner's affidavit and the affidavit of Yolanda Summers as to the sequence of events where petitioner was not present when the men shot up the block, but ran onto the block shortly afterwards.

63.     We emphasize the fact that, as shown in Anderson's July 6, 2011 affidavit, he was never spoken to by anyone about the events until recently and specifically not by anyone on behalf of petitioner or his co-defendants. *See* Exhibit 5, Anderson Affidavit. In other words, this information is newly discovered evidence which could not have been obtained with due diligence by petitioner at the time of petitioner's plea.

***Summary of Sarah Wallace's Correspondence with Chris Ortiz***

64.     In her October 14, 2011 affidavit, investigative reporter Sarah Wallace explains that she became involved in this case when petitioner contacted her in 2006, asserted his innocence, and asked for her assistance. *See* Exhibit 8, Wallace Affidavit. Shortly thereafter she was able to obtain the telephone number of Ortiz and speak to him on the telephone.  In that conversation Ortiz told her that petitioner was innocent and had not been in the building on the day that Williams was shot.  Unfortunately, when she next spoke to him and requested an affidavit, he refused to provide one.  In any event, as with the hearsay information from Bryant, *see* ¶ 43, the very fact that Ortiz told Wallace that petitioner was not involved in the shooting should be a factor to be considered in the totality of the circumstances of his innocence. *See also*, Exhibit 9, Wallace Hearing Testimony at 1471-1475.

***Ballistics and Forensic Evidence Contradicts Prosecution's Theory of the Williams Shooting***

65.     In considering issues of actual innocence, the Court should also consider the objective evidence of the path of the bullet that caused Williams' death.  According to the autopsy report, and the testimony of the medical examiner, Dr. Monica Smiddy, at the trial of Green and Dushain, the course of the bullet wound, which entered Williams' body in his lower back, on the left side, was from back-to-front, left-to-right and upwards, ending up in Williams' neck.  *See* Exhibit 20, Medical Examiner Report at 2, and Exhibit 21, Medical Examiner Diagram. Regarding the path of bullet, Dr. Smitty testified at the trial of Green and Dushain:

> . . . It is a very typical gunshot entrance wound.  The bullet entered skin in the fatty tissue in the muscles of lower back then it traveled in through the abdominal cavity, and that is the cavity that contains the major organs like the liver, the spleen, the kidneys, the stomach.  So the bullet traveled - - it actually perforated - - it went through left kidney and then it traveled upwards.  The bullet traveled upwards through left thoracic cavity, the left side of the chest.  It perforated or went through the left lung, and then it went towards the midline of the body where it perforated the aorta and then it went upwards towards the neck, where it lodged within some of the soft tissues in front of the spine.

25

Exhibit 30, Dr. Smitty Trial Testimony at 2728-29. The upward course of the bullet through the body fits with Williams being shot from a lower level across the street as he had his back turned and was trying to get through the front door of the building.  The course of the bullet is totally contrary to the prosecution's false story of Williams being shot in the back while he was kneeling in the vestibule.

66.     Also significant is a lack of any forensic evidence indicating a scuffle or on-the-knees shooting in the vestibule.  As Detective Daley noted in a DD5 dated August 4, 1993, he and his partner, Detective Davis, did a forensic sweep of the vestibule of 162 West 123rd Street and they found no forensic evidence. They found no shells from the firing of any weapon and no indication that there had been a scuffle involving several people in the vestibule, and no evidence that anyone had been on their knees, as Williams was alleged to have been at the time of the shooting. *See* Exhibit 22, DD5 Signed by Detective Daley. Daley explained that he did not establish a crime scene in the building until August 4th because the police did not know on August 3rd that Williams had been shot, due to the initial understanding of medical personnel, prior to the autopsy, that Williams had died of a heart attack. Exhibit 31, Daley Trial Testimony at 315-16. Further, Daley noted that he and Davis found "No apparent signs of ballistic evidence nor traces of blood in area.  Floor had a [*sic*] even film of dust on it, no apparent signs of a clean up." *See* Exhibit 22, DD5 signed by Detective Daley.

67.     On August 3, 1993, the NYPD vouchered one .380 automatic caliber cartridge casing. The .380 shell casing was found in front of 155 West 123rd Street, across the street from 163 West 123rd Street, where Bobbitt and Williams were shot. The .380 shell casing was among 21 other spent rounds recovered in front of 155 West 123rd Street. The bullet found lodged in Williams neck was a .380 and the bullet was invoiced in connection with Williams' murder

investigation. Exhibit 32, Gannalo Hearing Testimony at 771-72. The bullet fragment recovered from Williams' body was determined to have been fired from the same weapon that fired the .380 shell casing found in front of 155 West 123rd Street. *Id*. at 775-79.

68.     At the Green and Duschain trial, petitioner alleges that Chris Ortiz, the only witness the prosecutors presented who claimed to have physically witnessed Williams' murder, falsely testified that Williams had been on his knees when he was shot and that his head was facing toward the street after he was shot. Exhibit 26, Ortiz Trial Testimony at 422; 438-440. However, defendants' counsel did not make an argument that the bullet trajectory was inconsistent with Ortiz testimony. It was not until the CPL § 440.10 hearing that petitioner and his co-defendants argued that the medical examiner's report was inconsistent with Ortiz testimony regarding the Williams shooting.

69.     Although ADA Rettler testified at petitioner's CPL § 440.10 hearing that Ortiz had shown him how Williams body had been in a prostate position when shot, Ortiz's trial testimony is very much to the contrary – Williams was on his knees with hands clasped and fell forward towards the basement stairs when he was shot. Exhibit 25, Rettler Hearing Testimony at 1072-76, 1078, 1081-83, 1099; *cf* Exhibit 26, Ortiz Trial Testimony at 422, 438-40. The bullet entered the left flank just above the hip and travelled in an upward position slightly forward until it lodged at the base of the neck. *See* Exhibit 20, Medical Examiner's Report and Exhibit 21, Medical Examiner's Diagram. The bullet did not strike any hard objects and did not change course in any meaningful way. *Id*. The path was essentially straight up and down path through the body; a path that could not have been created in accordance with the prosecution scenario at trial and at petitioner's CPL § 440.10 hearing, but rather in accordance with the petitioner's contention that Williams was shot by a person across the street firing upwards towards the building. *Id*.

70.     As Judge Pickholz found

If Williams was kneeling, the bullet path could only have been created if his buttocks were higher than the rest of his body, while his upper torso was bent forward, flat or at some low angle to the floor. It seems odd that Ortiz would have said that Williams was on his knees if he really meant that his upper body was lying on the floor. And if Williams was nearly flat on the floor, Green would have had to have shot him at an extremely low angle (i.e., at an angle close to the floor) to achieve the bullet path seen in Williams body . . . Moreover, if that is indeed the way that Williams was positioned, it is difficult to understand how Ortiz's testimony that, after he was shot, Williams "fell to the floor" "crunching" his hand a bit, or that he "fell forward" toward the steps.

Exhibit 14, Judge Pickholz Order and Opinion at 19.

71.     Judge Pickholz continued,

The combination of these factors makes it seem improbable that the bullet path was made in the way that the People contend. In contrast, the defendant's explanation for the path is intuitive and attractive. It is quite easy to imagine a shooter, standing some distance away, firing at a victim who is standing on steps, but who is bending his body forward in an attempt to minimize the shooter's target. Unlike the People's scenario, it requires no contortion on the part of the shooter. Additionally, defendant Green's ballistics expert confirmed that, in his experience, someone who hears gunshots often instinctively ducks and leans forward.

Exhibit 14, Judge Pickholz Order and Opinion at 20. However, Judge Pickholz did not make an ultimate conclusion as to which parties' version of the Williams shooting because "either scenario was technically possible." *Id.*

***Inconsistent Evidence Prosecutors Relied Upon at the Green and Dushain Trial Further Supporting Petitioner's Actual Innocence***

72.     During the trial of Green and Dushain, Hutchens and Ortiz testified that Williams was shot at close range. *See* Exhibit 26, Ortiz Trial Testimony at 439-440; Exhibit 33, Hutchens Trial Testimony at 2455. However, NYPD investigators did not find any traces of blood or forensic evidence consistent with either Hutchens's or Ortiz's testimony and noted that dust and grime was

present in the area Williams was allegedly shot, indicating that there was no signs of a clean-up. *See* Exhibit 22, DD5 Signed by Detective Daley.

73.     Hutchens testified that Williams was repeatedly assaulted for several minutes before he was shot. *See* Exhibit 33, Hutchens Trial Testimony at 2452-2455. However, the medical examiner's report does not note any signs of trauma on Williams's body consistent with the prolonged assault Hutchens described in her testimony. *See* Exhibit 20, Medical Examiner's Report and Exhibit 21 Medical Examiner's Diagram.

74.     Hutchens testified that petitioner, Ortiz, and Dushain had assaulted Williams before he was shot. *See* Exhibit 33, Hutchens Trial Testimony at 2453. Ortiz does not testify that anyone assaulted Williams. He testified instead that he and petitioner threw Williams to the floor and that he was on his knees, begging for his life before he was shot. *See* Exhibit 26, Ortiz Trial Testimony at 438-440.

75.     Ortiz testified that he entered 162 West 123rd Street with petitioner, after Dushain had called for them as they walked towards the building down the street and that they were in the building until Williams was allegedly shot. Exhibit 26, Ortiz Trial Testimony at 418; 438-40. Ortiz's testimony does not mention Hutchens's presence. Hutchens testified that when she arrived at 162 West 123rd Street, petitioner, Green, and Dushain were arguing with Williams. Exhibit 33, Hutchens Trial Testimony at 2449. Hutchens testified that she observed petitioner slapping Williams on the head and that Ortiz "came about five, ten minutes later." *Id*. at 2452. Ortiz did not testify to being separated from petitioner between the time they entered 162 West 123rd Street and the time that Williams was allegedly shot.

**<u>CONCLUSION</u>**

76.     The information in this addendum and in the supporting exhibits require reversal of petitioner's conviction. That conviction was obtained in violation of his statutory rights and rights under the United States and New York State constitutions. Without limiting the foregoing, there is significant and compelling evidence of actual innocence, much of it discovered during the course of petitioner's CPL § 440.10 motion, numerous instances when petitioner's counsel was ineffective, and there are material and significant Due Process and *Brady* violations. The prosecution's constitutional violations were material to petitioner's guilty plea and therefore his conviction must be vacated.

77.     The State Court's denial of petitioner's motion to vacate his conviction was contrary to, and/or involved an unreasonable application of, clearly established law and was based on an unreasonable determination of the facts in light of evidence presented in the State Court proceeding. *See* 28 U.S.C § 2254(d).