**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

**ARCHIE COSEY,**

                         **Petitioner,**

          **- against –**

**LYNN LILLEY, Superintendent of**
**Woodbourne Correctional Facility,**

                         **Respondent.**
_____

**18-cv-11260 (JGK)**

**OPINION AND ORDER**

**JOHN G. KOELTL, District Judge:**

    The petitioner, Archie Cosey, has petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C § 2254. The petitioner seeks to vacate his conviction, pursuant to his guilty plea, to conspiracy in the first degree in violation of New York Penal Law § 105.17 and murder in the second degree in violation of New York Penal Law § 125.25. The petitioner was sentenced to concurrent terms of 25 years to life in prison. In this second petition for a writ of habeas corpus, the petitioner raises three claims: (1) that he was denied due process because the State violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); (2) that he received ineffective assistance of counsel; and (3) that he is actually innocent. For the reasons discussed below, the petitioner's petition for relief is **dismissed.**

## I. Background

The following facts are taken from the petition, sworn declarations, and exhibits submitted in connection with this motion and are undisputed unless otherwise noted.

### A. The Petitioner's Plea

In 1997, the petitioner was charged with conspiracy in the first and second degrees for involvement in drug trafficking, second-degree murder, and second-degree kidnapping. Addendum to Pet. ¶ 14. On October 15, 1998, the petitioner pleaded guilty in the New York State Supreme Court, New York County, to one count of conspiracy in the first degree for the sale of narcotics and one count of murder in the second degree. Id. at ¶ 15. The murder concerned the death of James Williams on August 3, 1993 at 162 West 123rd Street in New York, New York. Kress Decl. Ex. A at 72. The trial judge, the Honorable Leslie Crocker Snyder, explained that while a conviction on both counts could lead to a penalty of 50 years to life, in exchange for his plea, the petitioner's ultimate sentence would be 25 years to life. Id. at 73-74. At the plea allocution, the petitioner told the court that "he might as well take [the plea]." Id. at 67. The trial court sought clarification, asking the petitioner if he wanted to "take the plea as opposed to going to trial," to which the petitioner replied "yes." Id. at 67-68. Although the petitioner initially said that he had not "spent a lot of time with [his]

attorney discussing" the plea, he later stated that he talked to his attorney about it "at some length." Id. at 68-69. When asked about the facts surrounding the murder, the petitioner at first stated that the murder "supposedly" occurred on 123rd Street. Id. at 72. The petitioner later clarified that he was present at the scene, prevented Williams from leaving the hallway of 162 West 123rd Street, and knew that Williams was about to be killed on the orders of Carl Dushain. Id. at 73. The petitioner also stated that he was pleading guilty of his own free will and that no one threatened him or forced him in any way to plead guilty. Id. at 68.

On November 10, 1998, the date fixed for his sentencing, the petitioner, acting pro se, moved the trial court to withdraw his guilty plea, asserting that he was innocent and had an alibi witness, that he was coerced into pleading guilty by threats to his family and statements by his codefendants' lawyers, and that his lawyer rendered ineffective assistance in handling his criminal case. Addendum to Pet. ¶ 16; Kress Decl. Ex. B at 80-84. Justice Snyder denied the petitioner's motion to withdraw his plea without holding an evidentiary hearing. Addendum to Pet. ¶ 16. She noted that the petitioner had affirmed his guilt in the plea allocution and that he knew of his alibi before he pleaded, that he had knowledge of threats to his family but did not convey them to his lawyer, who would have conveyed them to

3

the district attorney, and that the petitioner was attempting to withdraw his plea as a tactical move in order to be tried separately from his codefendants, Dushain and Danny Green. Kress Decl. Ex. B at 84-85, 89-90.[1] Justice Snyder considered the application to be "spurious" and "deliberately misleading." Id. at 87. Justice Snyder also noted that the evidence against the petitioner "both in the Grand Jury minutes and other sources [was] overwhelming." Id. at 89. Justice Snyder then sentenced the petitioner to concurrent terms of 25 years to life on the charges of conspiracy and murder. Id. at 91. On September 27, 2001, the Appellate Division, First Department, of the New York State Supreme Court affirmed the petitioner's conviction, and found that Justice Snyder properly exercised her discretion in denying the petitioner's application to withdraw his guilty plea. People v. Cosey, 730 N.Y.S.2d 434 (App. Div. 2001) (mem.). On November 8, 2001, Judge Smith denied the petitioner leave to appeal to the Court of Appeals. See People v. Cosey, 762 N.E.2d 934 (N.Y. 2001).

## B. The Grand Jury Testimony

Assistant District Attorney Luke Rettler initially presented the State's case to the grand jury. Two grand jury witnesses placed the petitioner at the scene of the Williams

---

[1] On October 7, 1998, jury selection had begun for the trial of Dushain and Green. See People v. Cosey, 52 N.Y.S.3d 247 (Table), 2016 WL 7812677, at *5 (Sup. Ct. 2016).

murder. The first was Edward Walker, who sold drugs as part of the drug organization headed by Dushain, and who testified at the grand jury with immunity. Kress Decl. Ex. U at 1444-45. Walker testified that he was present at the murder of Williams, that Dushain had ordered Green to kill Williams, and that Chris Ortiz and the petitioner beat and kicked Williams and prevented him from escaping the building so that Green could kill him. Id.; Szczepanski Decl. Ex. 8. The second was Janet Hutchens, who was also involved in the drug organization. Hutchens testified that she was present in the building at 162 West 123rd Street on August 3, 1993 and that she saw Ortiz and the petitioner prevent Williams from leaving the building. Hutchens testified that Dushain ordered Green to get the gun, and that Green got the gun and then shot Williams. Szczepanski Decl. Ex. 22 at 671-72. Hutchens also testified to the grand jury that she saw Walker, whom she referred to as Melo, standing by the door, on the steps. Id. at 671.

In October, 1997, Rettler learned that Walker had been incarcerated on August 3, 1993 and thus could not have witnessed Williams's murder. Kress Decl. Ex. U at 1597; Szczepanski Decl. Ex. 8. Walker was subsequently indicted for perjury. Kress Decl. Ex. U at 1599. On June 8, 1998, before the petitioner pleaded guilty, Rettler submitted an ex parte letter to the trial court, in which he disclosed that the State had discovered that Walker

was incarcerated on the date of Williams's murder, but Rettler argued that the perjured testimony was not material enough to warrant dismissal of the indictment against the defendants. Szczepanski Decl. Ex. 8. Rettler argued that Hutchens's testimony established every element of the murder charge against the petitioner, Dushain, and Green, and that Walker was able to testify about what happened that night, even though he was not there, because the petitioner had related that information to Walker. Id.; Kress Decl. Ex. U at 1662. In the letter, Rettler acknowledged that Walker's grand jury testimony had placed the petitioner at the scene of the crime. Szczepanski Decl. Ex. 8. However, Rettler did not note to the trial court that Hutchens had also testified in front of the grand jury that Walker was present at the murder. Id.; Kress Decl. Ex. U at 1700. Rettler was concerned that disclosure of Walker's perjury would endanger Walker's safety because in a prior case in which Dushain was sentenced to prison, members of Dushain's organization had attempted to kill the complaining witness prior to Dushain's trial. Szczepanski Decl. Ex. 8. Rettler feared that disclosure could endanger Walker's life. Kress Decl. Ex. U at 1612-13. Rettler also argued that no disclosure to the defendants should be required. While Rettler believed that Walker's perjury was

Brady or Rosario[2] material, Rettler represented to Justice Snyder that the prosecution would never call Walker as a witness because of Walker's perjury. Id. at 1604-1601; Szczepanski Decl. Ex. 8. Ultimately, Rettler did not disclose that Walker had testified falsely in the grand jury, and Justice Snyder did not require such disclosure. However, Rettler stipulated at the trial of Dushain and Green that Walker was incarcerated at the time of the murder. Kress Decl. Ex. U at 1619-20, 1676.

### C. The Trial of Dushain and Green

In November, 1998, the State proceeded to trial against Dushain and Green. Addendum to Pet. ¶ 17. Ortiz testified to the following at trial: Dushain believed that Williams had stolen money from Dushain's drug organization and decided to have Williams killed for $500. Kress Decl. Ex. E at 412-16. When it was dark on August 3, 1993, Dushain called Ortiz and the petitioner into the brownstone at 162 West 123rd St. Id. at 416-18. Present in the building were Dushain, Green, David Bobbitt, Ortiz, the petitioner, and Williams.[3] Id. at 418-19. Bobbitt took

---

[2] In People v. Rosario, 173 N.E. 2d 881, 883 (N.Y. 1961), the New York Court of Appeals held that the prosecution is required to provide defense counsel with any pretrial statements made by a prosecution witness, "[a]s long as the statement relates to the subject matter of the witness' testimony and contains nothing that must be kept confidential," so that defense counsel may determine whether the statement is useful for impeachment purposes.

[3] At trial, Ortiz referred to many of the participants by their nicknames. In the ex parte letter to the state trial court, the State explained that David Bobbitt was also known as "Disco" and Danny Green was also known as "Cash." Szczepanski Decl. Ex. 8. Williams was the carpenter and superintendent of 162 West 123rd Street. Id.

Williams upstairs, returned downstairs, and then walked out of the building. Id. at 420. Williams tried to get out of the building, but the petitioner and Ortiz stopped him and barricaded the door. Id. Green went upstairs to get the gun and fired an initial shot as he was coming down the stairs, towards Williams. Id. at 421. At this point, Williams was on his knees with his hands up, pleading with Green not to kill him. Id. at 422. Eventually, Green fired a second shot from a distance of about five feet away, this time hitting Williams in the back. Id. Williams was shot when he was kneeling, and his body then fell forward. Id. at 425-26.

Janet Hutchens, one of the grand jury witnesses, also testified at trial. Her testimony was as follows: Hutchens went to 162 West 123rd Street on the night of August 3, 1993 to meet Williams. Kress Decl. Ex. G at 2449. Dushain, Green, and the petitioner then arrived and began arguing with Williams in the building; Ortiz joined five to ten minutes later. Id. at 2450-52. Dushain told Hutchens to go to the rear apartment on the first floor and shut the door. Id. at 2451. Hutchens opened the door anyway and saw the petitioner and Ortiz beat Williams, while Green went upstairs to retrieve the gun. Id. at 2452-54. Green ultimately fired two shots at Williams, the second one of which hit Williams. Id. at 2455. Williams was already down, and after he was shot, laid out onto the floor. Id. Hutchens also

8

stated that at one time, she thought she saw Walker in the building, but said that Walker was actually outside the building. Id. at 2455-56.

Ortiz testified that Green, Ortiz, and the petitioner then left the building. Kress Decl. Ex. E at 426. Ortiz got about halfway down the block when another person shot up the building at 162 West 123rd Street and wounded Bobbitt. Id. at 428-29. The shooting was related to an entirely separate incident, in which an individual named Dido was killed "by his baby's mother's family over his daughter." Id. at 416, 428.

Dushain was eventually convicted of two counts of murder, (only one of which pertained to Williams), four counts of attempted murder (pertaining to two other people), kidnapping, three conspiracy charges, as well as other charges; Green was convicted of many of the same crimes, including murder. Kress Decl. Ex. N at 8; Resp't's Mem. in Opp'n at 3. Dushain was sentenced to 150 years to life in prison, while Green received 91 and two-thirds years to life imprisonment. Resp't's Mem. in Opp'n at 3.

### D. The First Habeas Petition

On August 6, 2002, the petitioner filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, in this Court. Addendum to Pet. ¶ 19. The petitioner claimed that the state trial court had abused its discretion by denying his

9

motion to withdraw his guilty plea without holding an evidentiary hearing. Id. The Honorable Shira A. Scheindlin denied the petition for failure to allege a violation of a federal right. Cosey v. Walsh, No. 02-CV-6251, 2003 WL 1824640, at *2 (S.D.N.Y. Apr. 8, 2003). The court stated that "even if [the] petition is construed as asserting a constitutional [due process] violation, it must nonetheless be denied," and examined the merits of the petition. See id. at *2–3. The court denied the petitioner a certificate of appealability. Id. at *3.

### E. The 440.10 Motion and Hearing

In October 2011, the petitioner filed a motion in the New York State Supreme Court, New York County, seeking to vacate his 1998 convictions under New York Criminal Procedure Law ("CPL") § 440.10. Addendum to Pet. ¶ 20. He claimed that he was actually innocent, that the State and the trial court had prevented Bobbitt from testifying on behalf of the petitioner, that the petitioner would have proceeded to trial had Bobbitt's testimony been available, and that the petitioner's trial counsel was ineffective for failing to argue that the petitioner was wrongly deprived of Bobbitt's testimony and failing to argue in support of the petitioner's motion to withdraw his guilty plea. Kress Decl. Ex. N at 12–13. Dushain and Green also joined the petitioner's 440.10 motion. Id. at 14.

10

The Honorable Ruth Pickholz granted a hearing (the "440.10 hearing") on the petitioner's claims, but declined to grant a hearing on whether trial counsel was ineffective for failing to argue in support of the petitioner's pro-se application to vacate his plea. See People v. Cosey, 52 N.Y.S.3d 247 (Table), 2016 WL 7812677, at *1 (Sup. Ct. 2016). Justice Pickholz found that counsel had "read all of the materials his client had prepared and fully presented the claim. [He] utilized the same efforts that any competent attorney would have in that situation." Kress Decl. Ex. N at 23. As additional evidence came to light during the hearing, Justice Pickholz extended the scope of the hearing to "whether Green's and Dushain's trial attorneys had been ineffective for failing to consult with and adduce the testimony of a ballistic expert and a medical examiner, and whether the prosecutor wrongly withheld certain information from the defense." Cosey, 2016 WL 7812677, at *1.

The testimony presented at the 440.10 hearing included: (1) recantation testimony by Hutchens; (2) testimony by Yolanda Summers, the petitioner's ex-wife; (3) testimony by Bobbitt; (4) testimony by the petitioner; (5) testimony by a reporter named Sarah Wallace, who discussed recantation statements made by Ortiz; (6) testimony by a witness named Donald Anderson; (7) evidence presented by forensic and ballistics experts; and (8) testimony by the prosecutor Luke Rettler. Id. at *9-*15.

11

### 1. The State Court's Analysis of the Petitioner's Actual Innocence Claim

The state post-conviction court rejected the petitioner's claim of actual innocence and concluded that the petitioner had failed to produce clear and convincing evidence that he was not present when Williams was shot.[4]

At the 440.10 hearing, Hutchens recanted her prior trial testimony and stated that the petitioner was not present at the shooting, that she did not know who killed Williams, that she stayed in the apartment the whole time, and that she believed Williams was killed by crossfire coming from outside the building. Id. at *11. Hutchens also testified that she did not hear the gunshots herself, but heard about the gunshots from others. Id. Hutchens stated that she had originally implicated the petitioner in the murder because she was angry with him for kidnapping and beating her in September, 1993, when she owed him money from her drug sales. Kress Decl. Ex. S at 1206-07, 1230-32. Justice Pickholz declined to credit Hutchens's testimony, finding that "the quality and substance of her hearing testimony indicate that she has limited regard for the truth." Cosey, 2016

---

[4] To prevail upon an actual innocence claim under New York State law, the defendant must produce clear and convincing proof of innocence. See People v. Hamilton, 979 N.Y.S.2d 97, 109 (App. Div. 2014); see also People v. Jimenez, 37 N.Y.S.3d 225, 230 (App. Div. 2016). After Justice Pickholz issued her decision, the New York Court of Appeals held that a defendant who pleads guilty cannot obtain relief under CPL 440.10(1)(h) based on a claim of actual innocence. See People v. Tiger, 110 N.E. 3d 509, 515-516 (N.Y. 2018).

WL 7812677, at *13. Justice Pickholz found that Hutchens "sometimes gave the impression of altering her account as she went along" and that her moral insight that it was "unfair to incarcerate Cosey for something that he hadn't done" "smack[ed] of a reason provided to please the court." Id.

Yolanda Summers, the petitioner's ex-wife and mother to two of his children, testified at the hearing that she and the petitioner had been sitting on the stoop of her building, one block away from 162 West 123rd Street, when they heard what sounded like firecrackers. Id. at *14. Summers testified that the petitioner ran up the block to investigate, out of concern that his brother was in the area. Id.; Kress Decl. Ex. P at 223.

Bobbitt testified that before he was shot by people attacking the brownstone in retaliation for Dido's death, he was sitting on the stoop eating and saw Williams "peek out" the front door. Kress Decl. Ex. Q at 186-88. As Dushain helped Bobbitt up the stairs after he was shot, Bobbitt saw that Williams was lying on the floor, shaking, and had white foam coming out of his mouth. Id. at 203-04. Bobbitt was puzzled because Williams had just been conscious when he peeked his head out the door and Bobbitt wasn't sure what happened to Williams because there was no blood in the hallway. Id. at 208. The state post-conviction court found that Bobbitt was not a credible witness because Bobbitt had submitted many affidavits, some of

which contained discrepancies, and because Bobbitt had a
financial incentive to assist the petitioner with his collateral
attack. See Cosey, 2016 WL 7812677, at *15. In a separate
letter, Bobbitt had promised the petitioner he would assist the
petitioner with his collateral attack and suggested that if the
petitioner were to prevail on a lawsuit for wrongful conviction,
Bobbitt would share in the windfall. Id. The court found that
because Bobbitt and the petitioner believed that they could
become millionaires if they overturned the murder conviction,
and because Summers could also share in the proceeds, the
financial incentive to overturn the petitioner's conviction cast
doubt on the credibility of the hearing testimony of Bobbitt,
Summers, and the petitioner. Id. at *17.

The petitioner's theory presented to the state post-
conviction court was that Williams was killed in the shooting to
avenge Dido's murder. The petitioner testified that he had been
sitting on his mother's stoop with Summers, heard what sounded
like firecrackers, and went up the block to make sure his
brother was not in the area. Kress Decl. Ex. O at 531-32. When
the petitioner arrived at 162 West 123rd Street, he helped a
wounded Bobbitt into a cab. Id. at 533. At the brownstone, he
also saw Williams and observed white foam coming out of
Williams's mouth. Id. at 534. The state post-conviction court
rejected this testimony because the court found that the

14

petitioner had entered a valid guilty plea. Furthermore, Justice Pickholz concluded that if the petitioner's plea were invalid, it would have contained statements that the petitioner must have known were false. She thus doubted the petitioner's credibility, stating that the petitioner "was willing to say almost anything if he believed that doing so would serve his purpose." Cosey, 2016 WL 7812677, at *17.

Justice Pickholz did not consider Sarah Wallace's statements about Ortiz's recantations. Sarah Wallace was an investigative reporter, who had contacted Ortiz about the shooting. Id. at *14. Wallace testified that Ortiz told her that the petitioner was not present at the shooting but had come running from the opposite direction to help Bobbitt. Id. However, Ortiz refused to sign an affidavit attesting to the statement and his statement was thus hearsay. Justice Pickholz explained that she had no way to test the reliability of Ortiz's statement to Wallace and therefore she discounted it completely. Id.

Justice Pickholz did not find that Donald Anderson's testimony showed the petitioner's innocence. Anderson, who did not testify at the trial of Dushain and Green, testified at the 440.10 hearing that he observed the petitioner running towards the building after the attackers fired on the building and that he observed the petitioner and Ortiz help Bobbitt get into a

cab. Id. at *15. However, Justice Pickholz found that Anderson's testimony did not preclude the possibility that the petitioner was present at the brownstone during Williams's execution, left, and then returned when he heard other shots. Id.

At the 440.10 hearing, Justice Pickholz also heard testimony about forensic evidence, which had not been given at trial. The bullet which killed Williams entered through Williams's lower back and traveled upward until it lodged in the base of his neck. Id. at *9. The petitioner argued that a shooter standing some distance away shot Williams, and Williams had bent his body forward to make himself smaller. Id. at *10. Justice Pickholz found that the path of the bullet strongly supported the petitioner's theory that Williams was shot in the shooting involving Dido. However, it was possible to reconcile the path of the bullet with the State's version of the shooting; although Ortiz had testified that Williams was on his knees when Green shot him, the bullet's path in Williams's body could have been created if Green had bent over or kneeled down when shooting Williams. Id. at *9-*10. While the petitioner's theory was more intuitive, Justice Pickholz reasoned that the State's scenario was not impossible and thus the petitioner, Green, and Dushain, had not established their actual innocence by clear and

convincing evidence. Id. at *10.[5] She also found that the ballistics evidence was ultimately inconclusive. Id.

## 2. The State Court's Analysis of the Petitioner's Claim that the Prosecutor and the Trial Court Prevented Bobbitt from Testifying and of the Petitioner's Ineffective Assistance of Counsel Claims

The state post-conviction court also rejected the petitioner's argument that the prosecutor and the trial court had prevented Bobbitt from testifying and that the petitioner's counsel was ineffective for failing to argue that the petitioner was wrongly deprived of Bobbitt's testimony. Bobbitt claimed that in October, 1997, he had informed the petitioner's counsel that he was willing to testify that he and Williams were victims of the same incident. Kress Decl. Ex. N at 13. The petitioner argued that the state trial court and prosecutor pressured Bobbitt into invoking his Fifth Amendment right on threat of

---

[5] The new forensic evidence presented at the hearing formed the basis for Justice Pickholz's decision to vacate the convictions of Dushain and Green due to ineffective assistance of counsel for failing to consult a forensic medical expert. The state post-conviction court noted that although the forensic evidence introduced at the hearing did not establish actual innocence by a clear and convincing standard, that evidence would have "created a formidable obstacle to a guilty verdict," and would have lent support to the defendants' version of events. Cosey, 2016 WL 7812677, at *23. Dushain and Green did not rest their case until two months after Ortiz testified and one month after the medical examiner testified; during this time, counsel could have sought forensic evidence, which would have cast doubt on the testimony of Ortiz. Id. Ortiz was a cooperating witness and his testimony was corroborated by Hutchens, whose own credibility could have been called into question had Walker's perjury been disclosed. Id. at *23. However, Justice Pickholz denied the petitioner's claim for ineffective assistance of counsel on this ground, because his counsel was not ineffective for failing to consult with an expert prior to the petitioner's guilty plea. The information available to his attorney at the time-the medical examiner's report-could not have alerted the attorney sufficiently to the weakness in the prosecution's theory. Id.

withdrawing Bobbitt's plea bargain, thus depriving the petitioner of exculpatory evidence. Id. Justice Pickholz found no evidence that the prosecutor did anything intentionally to make Bobbitt fear that the prosecution would seek retribution if Bobbitt testified for the defendants. Cosey, 2016 WL 7812677, at *17. Because the underlying argument was meritless, Justice Pickholz also rejected the petitioner's claim that his attorney was ineffective for failing to make the argument. Id.

### 3. The State Court's Analysis of Newly Discovered Ex Parte Evidence

The Court also expanded the scope of the hearing when, at the 440.10 hearing, the petitioner, Dushain, and Green learned for the first time that Walker had perjured himself in his grand jury testimony and that the prosecutor had submitted an ex parte letter to Justice Snyder discussing Walker's perjury. Pet'r's Mem. in Supp. at 4; Szczepanski Decl. Ex. 8. This information eventually led Justice Pickholz to vacate the convictions of Dushain and Green for Brady violations. Justice Pickholz held that the State did not act improperly in placing the matter before the state court judge without specifically highlighting that Hutchens had also testified that Walker was present, because the State had supplied a separate transcript of Hutchens's testimony with their letter that effectively highlighted the issue. Cosey, 2016 WL 7812677, at *19. Further,

18

Justice Pickholz found that the State believed in good faith that Walker's life would be placed in danger if the information were shared with the defendants. Id. However, Justice Pickholz found that the State had violated its obligations under Brady and Giglio. In order to receive a fair trial, the defendants, Green and Dushain, had a right to material evidence that impeached a key prosecution witness, namely Hutchens;[6] this right outweighed any potential risk the release of the information could have had to Walker's safety. Id. at *20. Hutchens was one of two key prosecution witnesses to the murder, and had the jury known about Walker's perjury, the jury could have believed that Hutchens had intentionally lied about Walker's presence. This would have cast doubt on Hutchens's account of other events at trial relevant to the murder. Id. at *21. Accordingly, Justice Pickholz vacated the convictions of Green and Dushain for the murder of Williams. Id.

Justice Pickholz rejected the petitioner's argument that had he known of Walker's perjured testimony before the grand jury and the weakness that the testimony would cause in the state's case, the petitioner would not have pleaded guilty. Id.

---

[6] The state post-conviction court explained that under Brady v. Maryland, 373 U.S. 83, 87 (1963), "[a] defendant has the right to discover favorable information in the possession of the state that is material [to] his guilt or punishment," and that under Giglio v. United States, 405 U.S. 150, 154-55 (1972), "[t]his right extends to material evidence which impeaches a key prosecution witness." Cosey, 2016 WL 7812677, at *20.

Justice Pickholz found that weighing Walker's safety against the defendant's right to a fair trial, the appropriate time for the State to disclose the existence of the perjured testimony was when Hutchens was about to testify at trial. Id. at *20. Because the petitioner's plea took place before the balance of the factors favored disclosure and the State was not obligated to disclose Walker's perjury to him prior to his plea, the petitioner's motion to vacate his conviction on Brady and Giglio grounds was denied. Id. at *21 (citing People v. Holloway, 823 N.Y.S.2d 17 (App. Div. 2006); United States v. Ruiz, 536 U.S. 622 (2002); People v. Jones, 375 N.E.2d 41 (N.Y. 1978)).

Accordingly, the court denied the petitioner's motion in its entirety, while vacating Green and Dushain's convictions for the murder of Williams based on ineffective assistance of counsel and Brady violations. The petitioner applied for leave to appeal Justice Pickholz's order; on September 19, 2017, the New York State Supreme Court, Appellate Division, First Department, denied the petitioner's application. People v. Cosey, Archie, No. M-2689, 2017 WL 4159289 (App. Div. Sept. 19, 2017). The petitioner then applied for leave to appeal to the New York State Court of Appeals; on December 4, 2017, his application was dismissed "because the order sought to be appealed from is not appealable under CPL 450.90(1)." Szczepanski. Ex. 7.

### F. The Current Habeas Petition

On December 3, 2018, the petitioner filed this petition pursuant to 28 U.S.C. § 2254, in which he challenges his conviction pursuant to his guilty plea on grounds of Brady and due process violations; ineffective assistance of counsel based on the failure (1) to develop expert evidence, (2) to argue that the prosecutor and the trial court pressured Bobbitt to assert a Fifth Amendment privilege and become unavailable as a witness, and (3) to support the petitioner's withdrawal of his guilty plea; and actual innocence. Pet. at 3. On February 8, 2019, the respondent moved to transfer this petition to the Court of Appeals for the Second Circuit as an unauthorized second or successive habeas petition because it challenged the same judgment of conviction that the petitioner collaterally attacked in the Section 2254 petition that he filed in this court on August 6, 2002. On March 13, 2019, this Court granted the respondent's motion and stayed the case. Dkt. No. 12. On May 25, 2019, the Court of Appeals granted the petitioner's motion for leave to file a successive Section 2254 petition, noting that the petitioner had made a prima facie showing that the requirements of Section 2244(b)(2) were satisfied. Dkt. No. 14. The Court of Appeals directed this Court to address, "as a preliminary inquiry under § 2244(b)(4), whether [the petitioner] has in fact satisfied the requirements of § 2244" and "to the

21

extent the petitioner raises actual innocence claims, [to]
decide in the first instance whether those claims must satisfy
the § 2244(b)(2) standards." Id.

### II. The Threshold Requirements of 28 U.S.C. § 2244

A successive petition brought on the basis of newly
discovered evidence must meet the relevant threshold
requirements of 28 U.S.C. § 2244, which are found in Section
2244(b)(2)(B) and Section 2244(d).

### A. The Requirements of 28 U.S.C. § 2244(b)(2)(B)

The Antiterrorism and Effective Death Penalty Act ("AEDPA")
imposes "stringent limits on a prisoner's ability to bring a
second or successive application for a writ of habeas corpus."
Torres v. Senkowski, 316 F.3d 147, 150 (2d Cir. 2003). AEDPA's
gatekeeping provisions require that a second and successive
Section 2254 petition alleging newly discovered evidence be
dismissed unless

> (i) the factual predicate for the claim
> could not have been discovered previously
> through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if
> proven and viewed in light of the evidence
> as a whole, would be sufficient to establish
> by clear and convincing evidence that, but
> for constitutional error, no reasonable
> factfinder would have found the applicant
> guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(B). Essentially, the claim must rely on
"new facts showing a high probability of actual innocence."

<u>Gonzalez v. Crosby</u>, 545 U.S. 524, 530 (2005). The term "previously" in Section 2244(b)(2)(B)(i) requires that the factual predicate could not have been presented in the original habeas petition. <u>See</u> <u>Watson v. Artuz</u>, 283 F. Supp. 3d 217, 230 (S.D.N.Y. 2018), <u>report and recommendation adopted</u>, No. 99-CV-1364, 2019 WL 762221 (S.D.N.Y. Feb. 21, 2019).[7]

Section 2244(b)(2)(B) codifies a modified version of the judicially-created "miscarriage of justice" gateway to habeas review. This exception, also known as an actual innocence exception, allows "a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief" upon "a credible showing of actual innocence." <u>McQuiggin v. Perkins</u>, 569 U.S. 383, 392 (2013). The claim of actual innocence is not itself a constitutional claim, but instead serves as a gateway through which a habeas petitioner may pass to have his otherwise barred constitutional claim considered on the merits. <u>See</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 315 (1995). In Section 2244(b)(2)(B), Congress codified a modified version of this miscarriage of justice exception for petitioners filing successive petitions by imposing two more stringent requirements: first, in Section 2244(b)(2)(B)(i), an

---

[7] The Court of Appeals for the First, Fifth and Eighth Circuits have all defined "previously discoverable" to require that the factual predicate could not have been discoverable at the time of the previous habeas petition. <u>See</u> <u>In re McDonald</u>, 514 F.3d 539, 545 n.4 (6th Cir. 2008) (collecting different definitions from other Circuits).

added due diligence requirement; and second, in Section 2244(b)(2)(B)(ii), a heightened standard of proof, namely that by clear and convincing evidence, but for the constitutional error, no reasonable factfinder would have found the petitioner guilty of the underlying offense. See McQuiggin, 569 U.S. at 396.

In this second and successive habeas petition, the petitioner claims that the state trial court in his Section 440.10 proceeding erred in denying his claims of Brady and due process violations and ineffective assistance of counsel. The petitioner also asserts a separate, freestanding actual innocence claim.

## 1. The Deference Shown To the State Court's Factual Findings

When a federal court reviews the merits of a habeas petition, the "factual findings of the New York Courts are presumed to be correct." Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997) (internal quotation marks and citation omitted). This presumption is "particularly important when reviewing the trial court's assessment of witness credibility." Cotto v. Herbert, 331 F.3d 217, 233 (2d Cir. 2003). The petitioner may rebut this presumption only by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1). The Court of Appeals for the Second Circuit has not explicitly held that this presumption of correctness that applies to a state court's findings of fact in a district

court's analysis of a petition's merits under Section 2254(e) also applies to a district court's analysis of whether a petition has met AEDPA's threshold requirements under Section 2244. See Watson, 2019 WL 762221, at *10. Several courts in this Circuit have held that the presumption of correctness codified in Section 2254(e) should apply to a court's analysis of gateway actual innocence claims in the context of Section 2244. See Jimenez v. Lilley, No. 16-CV-8545, 2017 WL 4535946, at *8 (S.D.N.Y. Oct. 10, 2017) (collecting cases), report and recommendation adopted, No. 16-CV-8545, 2018 WL 2768644 (S.D.N.Y. June 7, 2018) (noting that Section 2254(e) should apply "in all federal habeas corpus proceedings"); Green v. Capri, No. 9:17-CV-0392, 2018 WL 2452623, at *5 & n.6 (N.D.N.Y. May 31, 2018) (citing other appellate courts' application of Section 2254(e)'s presumption of correctness to procedural gateway claims of actual innocence); Watson, 283 F. Supp. 3d at 234-35 (same); Watson, 2019 WL 762221, at *10 & n.2 (declining to decide the issue). The presumption of correctness in Section 2254(e) is not limited to a decision on the merits of the petition. Moreover, because the state post-conviction court that presided over the petitioner's Section 440.10 claim called multiple witnesses, and there has been no new testimony or hearing in this matter before this Court that would contradict the Court's findings, the state court was in the best position

to analyze the credibility of the proffered testimony and facts. Accordingly, the presumption of correctness applies to the state post-conviction court's findings in this Court's analysis of whether the petitioner has met the requirements of Section 2244(b)(2) and Section 2244(d)(1).

### 2. The Petitioner's **Brady** and Due Process Claims

The petitioner argues that the State did not turn over evidence of Walker's perjury in violation of the petitioner's Brady rights and that the State's ex parte letter to Justice Snyder violated his rights to due process. The respondent concedes, for the purposes of argument, that the petitioner has met the standard for Section 2244(b)(2)(B)(i) for his Brady and due process claims because the evidence underlying the claims only came to the petitioner's attention during the 440.10 hearing, and the petitioner could not have discovered that evidence earlier through the exercise of due diligence. However, the respondent argues that the contents of the ex parte letter and the facts underlying the allegedly suppressed Brady evidence, namely evidence of Walker's perjury, viewed in light of the evidence as a whole, would be insufficient to prove by clear and convincing evidence that no reasonable factfinder would have found the petitioner guilty of the murder, as is required by Section 2244(b)(2)(B)(ii).

26

The fact that Walker was not present at the murder of Williams does not demonstrate that the petitioner was not present at the scene of the murder or could not have committed the acts in question. Walker's absence from the scene "means [he] cannot inculpate petitioner (or anyone else), but neither can [he] exonerate him. [He] simply has no eyewitness evidence bearing on either petitioner's guilt or his innocence." Hyman v. Brown, 927 F.3d 639, 665 (2d Cir. 2019). Therefore, Walker's absence and inability to testify to what actually happened at the scene is not the kind of clear and convincing evidence with which no reasonable factfinder would have found the petitioner guilty of the murder charge.

The evidence of Walker's perjury also does not change the fact that other evidence, such as the petitioner's statements in his guilty plea allocution, also support the petitioner's guilt. A habeas court may consider a guilty plea in the context of determining whether a petitioner has shown that no reasonable factfinder would have found him guilty, as required by Section 2244(b)(2)(B)(ii). See Rosario v. United States, 164 F.3d 729, 734 (2d Cir. 1998) (considering petitioners' inculpatory plea allocution statements in rejecting petitioners' actual innocence claims in the context of Section 2255 petition); see also Doe v. Menefee, 391 F.3d 147, 168-69 (2d Cir. 2004) (holding that the petitioner's plea admissions could be considered evidence of

guilt in the context of a procedural actual innocence gateway claim). The petitioner argues that many of his allocution statements were unconvincing. However, whenever the petitioner made a vague statement, such as that he "might as well take the plea," that the murder "supposedly" occurred on West 123rd Street, and that he hadn't spent a lot of time speaking to his attorney about it, the sentencing judge asked for and received confirmation from the petitioner that he wanted to accept the plea, that the murder did occur on West 123rd Street while the petitioner was present, and that the petitioner had spoken to his attorney at length about his plea. Further, the petitioner conceded that he prevented Williams from leaving the hallway of 162 West 123rd Street and knew that Williams was about to be killed on Dushain's orders. The petitioner's conviction was subsequently affirmed by the Appellate Division, which found that the plea was voluntary. Thus, the petitioner's statements represent significant evidence supporting his guilt.

The state post-conviction court also rejected the petitioner's argument that he was actually innocent based on forensic evidence and the credibility of witness testimony presented at the hearing. Although the court noted that forensic evidence of the bullet's path through Williams's body was strong evidence in favor of the petitioner's theory, Justice Pickholz did not find that it clearly and convincingly established the

defendants' innocence because it was possible to reconcile the forensic evidence with the prosecution's theory of the case. Justice Pickholz also found that the testimony of Hutchens, Summers, and Bobbitt was not credible. The petitioner has failed to demonstrate that Justice Pickholz's credibility findings are incorrect by clear and convincing evidence.

The state post-conviction court also declined to consider Ortiz's recantation statements, as presented by Wallace, because Justice Pickholz could not assess the reliability of Ortiz's unsworn hearsay statements. Similarly, the Court of Appeals for the Second Circuit has held that unsworn recantations do not constitute "evidence"—much less "clear and convincing evidence"—within the meaning of 28 U.S.C. § 2244(b)(2)(B), and has declined to authorize the filing of a successive petition on such unsworn recantation evidence under 28 U.S.C. § 2244(b)(3)(C). See Haouari v. United States, 510 F.3d 350, 354 (2d Cir. 2007). Accordingly, the petitioner has failed to show that had Walker's perjured testimony been revealed, no reasonable factfinder would have found the petitioner guilty of the murder charge. The petitioner's Brady and due process claims therefore fail to meet the requirements of Section 2244(b)(2)(B).

### 3. The Petitioner's Ineffective Assistance of Counsel Claims

The petitioner also raises an ineffective assistance of counsel claim, based on three alleged failures of his trial counsel: (1) to develop a defense around possible inconsistences between Ortiz's account of how Williams was shot and the path of the bullet through Williams's body, (2) to argue that the prosecutor and trial court pressured Bobbitt to assert a Fifth Amendment privilege and become unavailable as a witness to testify on the petitioner's behalf, and (3) to support the petitioner's withdrawal of his guilty plea.

Section 2244(b)(2)(B)(i) requires that the factual predicate of a claim could not have been discovered previously through the exercise of due diligence. The petitioner filed his first habeas petition on August 6, 2002, alleging that the state court had abused its discretion by denying his motion to withdraw his guilty plea without holding an evidentiary hearing. Accordingly, the relevant inquiry is whether the petitioner had notice of the facts relating to his claims for ineffective assistance of counsel on August 6, 2002.

The first basis for the petitioner's ineffective assistance of counsel claim is that his trial counsel did not develop a defense around inconsistences between Ortiz's account of how Williams was shot and the path of the bullet through Williams's body. At the 440.10 hearing in 2015, the petitioner's counsel

testified that at the time of the petitioner's guilty plea, he
had not yet retained an expert to provide medical evidence for
the petitioner's case. Kress Decl. Ex. Y at 1801-02. Because the
plea occurred prior to trial, Ortiz had not yet testified. Id.
at 1802. There was therefore no way for counsel to know that
there was a possible discrepancy, between the way Ortiz
described the shooting and the actual path of the bullet through
Williams's body, on which counsel could have built a defense
based on forensic evidence. As the state post-conviction court
noted, the petitioner's counsel could not have known from the
medical examiner's report alone that there was a weakness in the
prosecution's case; such weakness became apparent only after
Ortiz testified at trial.

The petitioner argues that other evidence, apart from
Ortiz's trial testimony, would have alerted the petitioner's
trial counsel about the weakness of the State's case.
Specifically, the petitioner points to the medical examiner's
report and a police report relating to the crime scene of
Williams's murder, both of which the petitioner acknowledged
were available to counsel prior to his guilty plea. Szczepanski
Decl. Ex. 10; Pet. Ex. 22. The petitioner's admission that his
counsel should have known about the weakness of the State's
case, prior to his guilty plea, forecloses his ineffective
assistance of counsel claim in this petition, because the

31

petitioner could have brought those claims in his first habeas petition. The petitioner has plainly failed to satisfy the requirement in Section 2244(b)(2)(B)(i) that the claim could not have been discovered previously with the exercise of due diligence.[8]

The two remaining bases for the petitioner's ineffective assistance of counsel claims are that the petitioner's counsel failed to argue that the prosecutor and the trial court pressured Bobbitt to assert a Fifth Amendment privilege and to become unavailable as a witness to testify on the petitioner's behalf and that the petitioner's counsel failed to support the petitioner's withdrawal of his guilty plea. All of the information necessary to assert those claims was known to the petitioner prior to the filing of his first habeas petition. The petitioner concedes that these two grounds for ineffective assistance fail to meet Section 2244(b)(2)(B)(i)'s standards.

Nevertheless, the petitioner argues that the requirements of Section 2244(b)(2)(B)(i) should be relaxed because his first habeas petition was filed pro se. It is true that a pro se petitioner's petition should be "read liberally and should be interpreted 'to raise the strongest arguments that [it]

---

[8] At oral argument, counsel for the petitioner admitted that this information was available to the petitioner at the time of the first habeas petition and asked the Court to ignore the defect given the petitioner's pro se status at the time of the first habeas petition.

suggest[s].'" Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)

(citing Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)).

However, the significant procedural leniency that courts afford

pro se petitioners does not extend to excusing a pro se

petitioner's failure to meet the statutory requirements of

Section 2244(b)(2)(B)(i). See Traguth v. Zuck, 710 F.2d 90, 95

(2d Cir. 1983) (acknowledging that pro se status "does not

exempt a pro se party from compliance with the relevant rules of

procedural and substantive law"). Accordingly, the petitioner's

ineffective assistance of counsel claims fail to meet the

requirements of Section 2244(b)(2)(B).

### 4. The Petitioner's Freestanding Actual Innocence Claim

The petitioner also asserts a freestanding actual innocence

claim unmoored to any other claim of a constitutional violation.

The Court of Appeals for the Second Circuit directed this Court

to consider in the first instance whether a claim of actual

innocence must satisfy the gateway standards of Section

2244(b)(2).

The Supreme Court has recognized that a freestanding actual

innocence claim is a means to avoid a procedural bar to a

federal court's consideration of a petition for habeas corpus

relief. See Schlup, 513 U.S. at 315. Whether a habeas petitioner

is entitled to relief on the merits based on a freestanding

claim of actual innocence in a non-capital case is a question

33

that has not been resolved by the Supreme Court or the Court of Appeals for the Second Circuit. See McQuiggin, 569 U.S. at 392; Dist. Attorney's Office v. Osborne, 557 U.S. 52, 71-72 (2009) (open question whether claim of innocence may be adjudicated in noncapital case); House v. Bell, 547 U.S. 518, 554-55 (2006) (declining to resolve issue left open by Herrera v. Collins, 506 U.S. 390 (1993), whether freestanding innocence claims may be entertained by federal courts); Bryant v. Thomas, 725 F. App'x 72, 73 (2d Cir. 2018) ("Federal law as of yet does not recognize freestanding actual innocence claims.").[9]

In House, the Supreme Court declined to resolve the issue of whether such a claim is cognizable, instead noting only that, "whatever burden a hypothetical freestanding innocence claim would require" would be extraordinarily high and was unsatisfied in the case before it. 547 U.S. at 555. However, the Court noted that the standard to obtain relief in a freestanding claim "requires more convincing proof of innocence than [the standard to establish a gateway claim to bypass a procedural default] in Schlup." Id.

---

[9] Because the Supreme Court has never determined that there is a constitutional claim of actual innocence in a non-capital case, the petitioner could not rely on such an argument to satisfy 28 U.S.C. § 2244(b)(2)(A), which requires that an applicant show "that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."

However, for second and successive petitions, Congress established the stringent procedural requirements of Section 2244(b)(2)(B)(ii), which are inconsistent with a freestanding actual innocence claim being used as a gateway to avoid the requirements of that section. In relevant part, that section provides that a claim in a second or successive petition "shall be dismissed" unless "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii) (emphasis added). Hence, on its face, the statute requires not only sufficient evidence of actual innocence, but also a constitutional error. The claim of actual innocence would not itself be a sufficient basis to consider a second or successive habeas application.

The Courts of Appeals for the Tenth and Eleventh Circuits have held that a freestanding claim of actual innocence is insufficient for a federal court to consider a second or successive petition under Section 2244 and that a petition must allege some constitutional error, pursuant to Section 2244(b)(2)(B)(ii), for a district court to consider the merits of such a petition. See In re Davis, 565 F.3d 810, 824 (11th Cir. 2009) (per curiam) ("The statute undeniably requires a

petitioner seeking leave to file a second or successive petition to establish actual innocence by clear and convincing evidence and another constitutional violation."); Case v. Hatch, 731 F.3d 1015, 1037 (10th Cir. 2013). These Courts of Appeals have reasoned that a freestanding innocence claim is not itself considered a constitutional claim, that the plain language of Section 2244(b)(2)(B) specifically requires that a claim in a successive petition based on newly discovered evidence "shall be dismissed" unless it meets the requirements of Sections (b)(2)(B)(i) and (ii), and that because Section 2244(b)(2)(B)(ii) requires a constitutional error, a freestanding innocence claim cannot be the basis for relief in a second or successive petition. As the Court of Appeals for the Eleventh Circuit explained,

> Under the plain language of the statute, § 2244(b)(2)(B)(ii) requires both clear and convincing evidence of actual innocence—"clear and convincing evidence that . . . no reasonable factfinder would have found the applicant guilty of the underlying offense"—as well as another constitutional violation—"but for constitutional error." It is, in effect, an "actual innocence plus" standard.

Davis, 565 F.3d at 823.[10]

---

[10] The Court of Appeals for the Ninth Circuit cited Case and Davis with approval and noted that "section 2244(b)(2)(B)(ii) also requires petitioners to state a predicate 'constitutional error.'" Gimenez v. Ochoa, 821 F.3d 1136, 1143 (9th Cir. 2016). The court noted that "[t]he Supreme Court has never recognized 'actual innocence' as a constitutional error that would provide grounds for relief without an independent constitutional violation."

The Courts of Appeals for the Tenth and Eleventh Circuits have also held that requiring successive habeas petitions to be tethered to a constitutional violation does not foreclose review of a petitioner's freestanding claim of actual innocence. Therefore, it does not constitute an unconstitutional suspension of the writ of habeas corpus. Rather, because Section 2244 applies only to circuit and district judges, the petitioner may still pursue a freestanding innocence claim by petitioning the Supreme Court to hear the petition pursuant to its original jurisdiction. Case, 731 F.3d at 1037 (citing In re Davis, 565 F.3d at 827).[11]

The Supreme Court noted in Felker v. Turpin, "'the power to award the writ by any of the courts of the United States, must be given by written law,' Ex parte Bollman, 4 Cranch 75, 94, 2 L.Ed. 554 (1807), and we have likewise recognized that judgments about the proper scope of the writ are 'normally for Congress to make.' Lonchar v. Thomas, 517 U.S. 314, 323 (1996)." 518 U.S. 651, 664 (1996). In Felker, the Supreme Court found that AEDPA's requirements, which prevented the Court from reviewing a Court

---

Id. However, the court went on to note that the court had assumed but never held that petitioners could bring a freestanding actual innocence claim, but rejected the claim on the merits. Id. at 1145-46.

[11] In Davis, the Supreme Court transferred the petition to a Georgia district court to receive testimony and make findings of fact. See In re Davis, 557 U.S. 952 (2009). The district court conducted a hearing, found that the petitioner's newly discovered evidence was largely not credible, and denied the petitioner's petition for a writ. See In re Davis, No. CV409-130, 2010 WL 3385081, at *61 (S.D. Ga. Aug. 24, 2010).

of Appeals order denying leave to file a successive petition
under Section 2244(b)(3)(E), did not amount to an
unconstitutional suspension of the writ, because AEDPA did not
remove the Supreme Court's authority to entertain an original
petition for habeas relief. Id. at 661-64. Because the Supreme
Court may still entertain a petitioner's claim of actual
innocence on an original petition for habeas relief, AEDPA's bar
on bringing an actual innocence claim in a successive petition
does not improperly suspend the writ. See Davis, 565 F.3d at
827; Case, 731 F.3d at 1037. Because claims of actual innocence
brought in successive petitions must satisfy Section
2244(b)(2)'s standards, the petitioner's claim of actual
innocence, untethered to any claim of a constitutional
violation, provides no basis to hear his successive petition for
habeas corpus.

### B. The Requirements of Section 2244(d)

A second and successive habeas petition must also meet the
statute of limitations period set out in 28 U.S.C. § 2244(d)(1),
which states that

> (1) A 1-year period of limitation shall
> apply to an application for a writ of habeas
> corpus by a person in custody pursuant to
> the judgment of a State court. The
> limitation period shall run from the latest
> of--
>
> (A) the date on which the judgment became
> final by the conclusion of direct review or

the expiration of the time for seeking such
review; [or]
. . .
(D) the date on which the factual predicate
of the claim or claims presented could have
been discovered through the exercise of due
diligence.

If a petitioner fails to file his petition within Section
2244(d)'s statute of limitations period, he may overcome this
time bar if he shows that his petition should be equitably
tolled or that his petition is subject to the actual innocence
exception articulated in Schlup. See Watson, 2019 WL 762221, at
*6.

### 1. The Petition Is Untimely

The relevant provision that dictates when the statute of
limitations period began to run is Section 2244(d)(1)(D).[12] The

---

[12] The petitioner argues that Section 2244(d)(1)(A) is the proper provision to
use and that his judgment became final on December 4, 2017. After Justice
Pickholz denied the petitioner's 440.10 motion, the petitioner applied for
leave to appeal Justice Pickholz's order, which the Appellate Division, First
Department, denied on September 19, 2017. The petitioner then filed an
application for leave to appeal to the Court of Appeals, which was dismissed
on December 4, 2017. However, the "judgment" referred to in Section
2244(d)(1)(A) is the petitioner's conviction for murder, not the decision in
a state court collateral proceeding. See Adams v. Greiner, 272 F. Supp. 2d
269, 272-73 (S.D.N.Y. 2003) (finding that conviction was final under Section
2244(d)(1)(A) at the conclusion of direct review and that a 440.10 motion
filed within one year of the date the conviction became final tolled the
period of limitations under Section 2244(d)(2)); see also Collins v. Ercole,
No. 08-CV-7636, 2010 WL 11507380, at *2 (S.D.N.Y. Mar. 19, 2010) (same),
aff'd, 667 F.3d 247 (2d Cir. 2012). "[A] petitioner's conviction becomes
final for AEDPA purposes when his time to seek direct review in the United
States Supreme Court by writ of certiorari expires." Williams v. Artuz, 237
F.3d 147, 150 (2d Cir. 2001) (internal quotation marks and brackets omitted).
A party has ninety days in which to file a petition for a writ of certiorari
requesting review of a state court decision. Sup. Ct. R. 13(1); see also
Bowles v. Russell, 551 U.S. 205, 212 (2007). The petitioner pleaded guilty on
October 15, 1998. The state trial court denied the petitioner's motion to
withdraw his plea and imposed sentence on November 10, 1998; the conviction

petitioner argues that his petition is timely because he only discovered new evidence at the 440.10 hearing and the time to bring this petition was appropriately tolled while he sought to appeal the denial of his 440.10 motion. In calculating whether the limitations period has lapsed, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted." 28 U.S.C. § 2244(d)(2).

A "petition is 'pending' from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures." Bennett v. Artuz, 199 F.3d 116, 120 (2d Cir. 1999), aff'd, 531 U.S. 4 (2000); see also Carey v. Saffold, 536 U.S. 214, 220 (2002). Under New York law, a petitioner may seek leave to appeal a trial court's denial of a 440.10 post-conviction motion to the Appellate Division under CPL Section 450.15. See Klein v. Harris, 667 F.2d 274, 283-84 (2d Cir. 1981), overruled on other grounds by Daye v. Attorney Gen. of State of N.Y., 696 F.2d 186, 195 (2d Cir. 1982) (en banc); see also Friedman v. Rehal, 618

---

was affirmed by the Appellate Division on September 27, 2001 and the petitioner was denied leave to appeal on November 8, 2001. Because the petitioner did not seek review in the Supreme Court, his conviction became final 90 days after November 8, 2001 and his petition would be time-barred under Section 2244(d)(1)(A). However, because the petitioner is bringing this petition on claims of evidence that could not have been discovered until his 440.10 hearing, which occurred in 2014, the statute of limitations period is more appropriately governed by Section 2244(d)(1)(D).

F.3d 142, 152 (2d Cir. 2010). However, if a justice of the Appellate Division denies a certificate for leave to appeal pursuant to New York Criminal Procedure Law Section 460.15, a petitioner may not appeal to the Court of Appeals. "Thus, once the Appellate Division denied [the petitioner] leave to appeal the denial of his section 440.10 motion, he had reached the end of the road within the state system." Klein, 667 F.2d at 284 (internal quotation marks and citation omitted). Accordingly, "for purposes of calculating the tolling provision of § 2244(d)(2), AEDPA's one year statute of limitations is tolled from the date a petitioner files his . . . 440.10 motion until the date the Appellate Division denies the petitioner leave to appeal [the] decision [on the 440.10 motion]." Wilkins v. Kirkpatrick, No. 06-CV-2151, 2009 WL 3644082, at *7 (S.D.N.Y. Nov. 4, 2009). Thus, the petitioner had one year from September 19, 2017, the date on which leave to appeal to the Appellate Division was denied, to bring the current petition. However, the current petition was filed on December 3, 2018 and is thus time-barred.

The petitioner argues that these cases are inapposite and that the time from which the one-year statute of limitations period should have been calculated was December 4, 2017, the date on which his application for leave to appeal the Appellate Division's denial to the Court of Appeals was dismissed by a

Judge of the Court of Appeals "because the order sought to be appealed from is not appealable under CPL 450.90(1)."[13] Pet. Ex. 16. He argues that he was required to appeal his sentence to the Court of Appeals in order to comply with AEDPA's exhaustion requirements.[14] In support of this proposition, he states that the court in Garcia v. Herbert, No. 02-CV-2052, 2018 U.S. Dist. LEXIS 203454 (E.D.N.Y. Nov. 30, 2018), commented that "arguing before the Appellate Division that a sentence is unconstitutional gives the New York Court of Appeals the power to review that claim." Id. at *83. But the Garcia court made this statement in the context of discussing the differences between the jurisdictions of the Appellate Divisions and the New York Court of Appeals. The court did not purport to imply that an appeal to the New York Court of Appeals was "pending" when leave to appeal to the Appellate Division had been denied. Klein plainly held that no further state relief was pending when leave to appeal to the Appellate Division was denied. "An effort to exhaust state remedies by procedures that are not authorized by

---

[13] N.Y. CPL 450.90(1) cited by Judge Rivera in denying leave to appeal to the New York Court of Appeals is the provision that authorizes an appeal to the Court of Appeals if a certificate granting leave to appeal has been granted, a certificate that the petitioner had failed to obtain.

[14] "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]" 28 U.S.C. § 2254(b)(1)(A). The petitioner argues, and the respondent does not contest, that the petitioner has satisfied the exhaustion requirement.

state law does not toll the one-year statute of limitations."
Friedman, 618 F.3d at 152 n.3.

After the state court decided the petitioner's 440.10 motion on December 21, 2016, the petitioner sought leave to appeal the order to the Appellate Division. A justice of the Appellate Division, First Department, denied leave to appeal on September 19, 2017. At that point, no further appellate review under state law was available and the tolling of the limitations period under Section 2244(d)(2) ceased; the statute of limitations period under Section 2244(d) thus expired one year later. The petitioner did not file this petition until December 3, 2018, more than two months after the limitations period had expired. Accordingly, his petition is untimely.

## 2. The Petitioner Is Not Entitled to Equitable Tolling

The AEDPA limitations period is "subject to equitable tolling in appropriate cases." Holland v. Florida, 560 U.S. 631, 645 (2010). A petitioner must show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Rivas v. Fischer, 687 F.3d 514, 538 (2d Cir. 2012) (citation omitted). "[E]quitable tolling is warranted only in rare and exceptional circumstances." See Harper v. Ercole, 648 F.3d 132, 136 (2d Cir. 2011) (internal quotation marks and citation omitted).

The extraordinary circumstance that the petitioner argues justifies equitable tolling is that AEDPA required that he appeal the state court's determination to the Court of Appeals to exhaust his claim. The Court of Appeals denied the petitioner's application on December 4, 2017. If the one-year period of limitations began running on this date, the petition, which was filed on December 3, 2018, would have been timely. As discussed above, however, the petitioner's reasoning for why AEDPA's limitations period should have been tolled between the time that the Appellate Division denied leave to appeal the state court's decision on the 440.10 motion and the date that the Court of Appeals denied leave to appeal the Appellate Division's denial is without merit.

Courts have generally stated that legal mistakes by attorneys "normally will not constitute the extraordinary circumstances required to toll the AEDPA limitations period." Baldayaque v. United States, 338 F.3d 145, 151-52 (2d Cir. 2003). However, attorney error that is so outrageous or extraordinary may render circumstances extraordinary. See id.; see also Dillon v. Conway, 642 F.3d 358, 363 (2d Cir. 2011) (examples of extraordinary circumstances include corrections officer's intentional confiscation of prisoner's petition shortly before filing deadline, state appellate court's failure to inform prisoner that his leave to appeal was denied, and

44

attorney's failure to file petition on behalf of prisoner after receiving explicit directions to do so).

"Because a lawyer is the agent of his client, the client generally must bear the risk of attorney error." Rivas, 687 F.3d at 538 (citing Holland, 560 U.S. at 650). A simple miscalculation that causes a lawyer to miss a filing deadline does not warrant equitable tolling. Id. For an attorney's failure to rise to the level of an extraordinary circumstance for purposes of tolling Section 2254's limitations period, it "must be so egregious as to amount to an effective abandonment of the attorney-client relationship." Id. The petitioner's counsel's incorrect legal interpretation of the law does not constitute an extraordinary circumstance. To the extent that the petitioner did not rely on his attorneys in deciding when to file his petition, a petitioner's pro se status also does not merit equitable tolling. Smith v. McGinnis, 208 F.3d 13, 18 (2d Cir. 2000). Accordingly, the circumstances are insufficient to justify equitable tolling.

### 3. The Actual Innocence Equitable Exception

The Supreme Court has recognized that a "credible" and "compelling" claim of actual innocence may provide a "gateway" to bypass procedural barriers to habeas relief for successive petitions. See Schlup, 513 U.S. at 324. The Court of Appeals for the Second Circuit has characterized this actual innocence claim

as an "equitable exception to §2244(d)(1)," as opposed to a type

of equitable tolling. Rivas, 687 F.3d at 547 n.42. An actual

innocence claim is a procedural mechanism that would allow a

habeas petitioner to have his otherwise barred constitutional

claim considered on the merits. Schlup, 513 U.S. at 315, 324;

Rivas, 687 F.3d at 541. This procedural actual innocence claim

thus differs from the petitioner's substantive freestanding

claim of actual innocence, which is not itself tied to any

constitutional violation. See Schlup, 513 U.S. at 315. To obtain

habeas relief in the face of a procedural obstacle such as a

time-barred petition, a petitioner must "advance both a

legitimate constitutional claim and a credible and compelling

claim of actual innocence." Rivas, 687 F.3d at 540; see also

Schlup, 513 U.S. at 315.

### a. The Equitable Exception Applies to Successive Petitions for Habeas Corpus

The respondent argues that the gateway actual innocence

exception to Section 2244(d)'s statute of limitations period

does not apply to successive habeas petitions. The respondent

relies on McQuiggin, in which the Supreme Court held that "[i]n

a case not governed by [Section 2244(b)(2)],[15] the miscarriage of

justice exception survived AEDPA's passage intact and

---

[15] The Supreme Court also noted that AEDPA required a petitioner seeking an
evidentiary hearing to show diligence and establish actual innocence by clear
and convincing evidence. See 28 U.S.C. § 2254(e)(2).

unrestricted," and that a showing of actual innocence under the Schlup standard could serve as a gateway to reviewing a first federal habeas petition otherwise time-barred by Section 2244(d)(1). 569 U.S. at 397. The Supreme Court noted that "[e]quitable principles have traditionally governed the substantive law of habeas corpus" and that a court should "not construe a statute to displace courts' traditional equitable authority absent the clearest command." Id. (citing Holland, 560 U.S. at 646). The Court further reasoned that Section 2244(d)(1) contained "no clear command countering the courts' equitable authority to invoke the miscarriage of justice exception to overcome expiration of the statute of limitations governing a first federal habeas petition." Id.

The respondents contend that McQuiggin limited the use of gateway innocence claims to first petitions for federal habeas relief. Although McQuiggin concerned a first habeas petition, the Court did not hold that the miscarriage of justice exception applied only to initial habeas petitions. Id. at 396-97. Section 2244(d)(1) contains no such clear command displacing the courts' equitable authority to allow gateway actual innocence claims to overcome the statute of limitations period governing a successive habeas petition. Congress enacted Section 2244(b)(2) specifically to account for the more rigid showing of actual innocence that would be required for a successive habeas

47

petition to be considered on the merits. To the extent that there are higher standards for successive petitions than for initial petitions, those higher standards are contained in Section 2244(b)(2), not in Section 2244(d).

The respondent argues that Section 2244(b)(4), which requires that a successive petition meet the requirements of "this section," means that a successive petition must also meet the statute of limitations period. Even assuming that "this section" includes all of 28 U.S.C. § 2244, the respondent's reading of "this section" simply means that a successive habeas petition is also governed by Section 2244(d).[16] That language has no bearing on whether successive petitions may be considered on the merits if they qualify for either equitable tolling or an equitable exception based on the gateway actual innocence claim articulated in Schlup.

Preserving the gateway actual innocence claim for a successive petition alleging newly discovered evidence would allow a court to consider a time-barred petition on its merits, only in the limited cases where a petitioner has met the stringent requirements under Section 2244(b)(2) and asserts a

---

[16] The petitioner argues that Section 2244(d)(1) does not apply to successive petitions. However, the statute clearly states that 2244(d)(1) applies to "an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." Because the petitioner is in custody pursuant to his conviction in state court and is bringing an application for a writ of habeas corpus, section 2244(d)(1) also applies to his petition. See Watson, 2019 WL 762221, at *6.

gateway innocence claim because his petition was filed outside the one-year statute of limitations period and was not subject to equitable tolling.[17,18] AEDPA sought "to eliminate delays in the federal habeas review process. . . while seeking to harmonize the new statute with prior law, under which a petition's timeliness was always determined under equitable principles." Holland, 560 U.S. at 648. Accordingly, in successive petitions, a gateway actual innocence claim applies as an equitable exception to Section 2244(d)(1)'s requirements.

### b. The Petitioner's Claims Are Not Subject to the Equitable Exception

Although gateway actual innocence claims may be asserted to overcome procedural violations of Section 2244(d)(1) in second and successive habeas petitions, the petitioner has failed to show that his actual innocence claim is sufficient to open the gateway and avoid the time barred nature of his claims.[19] To

---

[17] This was the procedural posture in Watson, 283 F. Supp. 3d 217. In Watson, the court found that the petitioner, who had filed a successive petition, had satisfied the provisions of Section 2244(b)(2)(B), that his petition was untimely, and that he was not entitled to equitable tolling. Id. at 233. In part because the respondent in Watson did not argue that the statute of limitations would act as a bar to a petition if the petitioner could show actual innocence, the court then proceeded to analyze whether the petitioner had met Schlup's standard for asserting a gateway actual innocence claim. Id. at 234.

[18] If a petition failed to meet Section 2244(b)(2)'s requirements, a court would not be able to entertain the petition on the merits, even if the petition were timely filed under Section 2244(d). Accordingly, the availability of the equitable exception to Section 2244(d)'s requirements in a successive petition alleging new evidence is limited to the narrow set of circumstances explained here.

[19] Because an actual innocence claim serves only as a gateway for a petitioner to have his otherwise barred constitutional claims considered, the equitable

qualify for the equitable exception, a claim of actual innocence must be both credible and compelling. Rivas, 687 F.3d at 541 (internal quotation marks and citations omitted). A claim is credible when it is "supported by new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial"; it is compelling when the petitioner can demonstrate that "more likely than not, in light of the new evidence . . . any reasonable juror would have reasonable doubt." Id. (internal quotation marks and citations omitted). The Court is required to consider all of the evidence, "old and new, incriminating and exculpatory, and, viewing the record as a whole, to make a probabilistic determination about what reasonable, properly instructed jurors would do." Id. at 542 (internal quotation marks and citation omitted). The purpose of the inquiry "is to identify those cases in which a compelling showing of actual innocence would make it a manifest injustice to maintain conviction unless it was free of constitutional error." Hyman, 927 F.3d at 658.

New evidence that the petitioner contends supports his gateway actual innocence claim consists of (1) Hutchens's recantation testimony, (2) testimony by Summers, (3) testimony

exception would not provide an avenue for the petitioner's freestanding claim of actual innocence, which is not itself a constitutional claim, to be considered.

by Bobbitt, (4) testimony by the petitioner, (5) Anderson's new testimony at the hearing, (6) the perjured testimony of Walker, (7) Wallace's account of Ortiz's recantation, and (8) forensic evidence provided at the 440.10 hearing.

The first four pieces of evidence are not credible under the Schlup standard. As discussed above, the state post-conviction court's determinations of the lack of credibility of witnesses are entitled to a presumption of correctness when the court is analyzing whether a petition has met AEDPA's gatekeeping provisions. The petitioner has not shown that Justice Pickholz's finding that the testimony of Hutchens, Summers, Bobbitt, and the petitioner was not credible was clear error. Moreover, Justice Pickholz's finding was well-supported in the record submitted. Accordingly, the new testimony presented at the 440.10 hearing fails to show the petitioner's claim is credible because the testimony was not reliable.

Although Justice Pickholz found Anderson's testimony to be credible, Justice Pickholz correctly noted that seeing the petitioner run towards the brownstone during the shooting in retaliation for Dido's death would not have precluded the possibility that the petitioner blocked Williams from leaving the hallway before Green shot Williams, left the brownstone, and returned when he heard shots again. Accordingly, Anderson's testimony is not compelling in that it does not demonstrate that

51

more likely than not, any reasonable juror would have reasonable
doubt that the petitioner committed the crime.

There is no dispute that Walker committed perjury in his
grand jury testimony and that the petitioner was not informed of
the perjury when the State learned of it. However, as discussed
above, the fact that Walker was not present at the murder
neither inculpates nor exculpates the petitioner. Accordingly,
evidence of Walker's perjury is not a compelling factor
supporting the petitioner's innocence. Nor is it sufficient that
Walker's perjured grand jury testimony about his presence at the
murder scene could have been used as a basis to impeach
Hutchens's trial testimony because Hutchens also placed Walker
at the scene. In the context of all her testimony, that single
discrepancy would not support a finding of the petitioner's
actual innocence.

The two remaining pieces of 440.10 hearing evidence could
be viewed as credible. The state court did not make a factual
finding as to the credibility of Ortiz's testimony. Although
unsworn recantations do not constitute evidence that courts may
consider under Section 2244(b)(2)(B), a gateway actual innocence
claim "focus[es] the inquiry on actual innocence" such that "a
district court is not bound by the rules of admissibility that
would govern at trial," but may "consider the probative force of
relevant evidence that was either excluded or unavailable at

trial." Schlup, 513 U.S. at 327-28; see also Hyman, 927 F.3d at 658 (noting that a court assessing factual innocence may consider even evidence inadmissible at trial). The state court found that Wallace was a credible witness and the state court did not doubt that Ortiz told her that the petitioner was not present at Williams's death. Cosey, 2016 WL 7812677, at *14. However, the state court noted that Ortiz himself was not present at the hearing and refused to sign an affidavit or submit to a television interview. It is possible that if Ortiz's recantation testimony was heard and was credible, this could weigh in favor of the petitioner on his gateway claim of actual innocence. Additionally, the state court found that the forensic evidence could raise a reasonable doubt as to how Williams was shot. Id.

Regardless of whether Ortiz's statement was credible or the forensic evidence was compelling, however, it is insufficient to show that more likely than not, any juror would have had a reasonable doubt as to the petitioner's guilt. This is because having a reasonable doubt would require the jury to set aside the petitioner's own statements in his plea allocution. Although the petitioner expressed some hesitation at various points during his plea, he ultimately admitted to his involvement in the murder of Williams. There is no credible evidence that the admissions the petitioner made at his plea allocution were

involuntary or unknowing. After listening to the petitioner's testimony at the 440.10 hearing, the state post-conviction court determined that the petitioner was not credible at the post-conviction hearing and was "willing to say almost anything if he believed that doing so would serve his purpose." Id. at *17. "A criminal defendant's self-inculpatory statements made under oath at this plea allocution carry a strong presumption of verity . . . and are generally treated as conclusive in the face of the defendant's later attempt to contradict them." United States v. Grzybek, 283 F. App'x 843, 845 (2d Cir. 2008) (citation omitted).

Accordingly, the petition should be dismissed as untimely under Section 2244(d)(1). The petitioner has failed to show that he is entitled to equitable tolling or the equitable exception for a showing of actual innocence that would otherwise provide a gateway to ignore the untimeliness of the petition and consider the merits of his constitutional claims.

In sum, the petition should be dismissed for failure to meet the requirements for a second or successive petition under Section 2244(b)(2) and the timeliness requirement under Section 2244(d)(1).

### III. The Merits of the Petition

For purposes of completeness, the petition should also be dismissed if it were eligible to be reviewed on the merits.

54

## A. The Requirements of Section 2254(d)

Because a state court adjudicated the petitioner's claims on the merits, the claims would be evaluated under the standard of review set forth in 28 U.S.C. § 2254(d). That section provides that an application for a writ of habeas corpus should only issue if adjudication of the claim in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see also Lynn v. Bliden, 443 F.3d 238, 245 (2d Cir. 2006). Moreover, "AEDPA sets forth a precondition to the grant of habeas relief . . . , not an entitlement to it, so even if the standard set forth in section [2254(d)] is met, the petitioner still bears the ultimate burden of proving by a preponderance of the evidence that his constitutional rights have been violated." Cardoza v. Rock, 731 F.3d 169, 178 (2d Cir. 2013) (internal quotation marks and citations omitted); Garner v. Lee, 908 F.3d 845, 860 (2d Cir. 2018).

A state court decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or

"if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the result reached by the Supreme Court. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision involves "an unreasonable application of . . . clearly established Federal law" when the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Id. at 407-08. In other words, "the state court decision [must] be more than incorrect or erroneous;" it "must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75 (2003). "[I]t is well established in [this] [C]ircuit that the objectively unreasonable standard of § 2254(d)(1) means that [a] petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief." Cotto, 331 F.3d at 248 (citation and internal quotation marks omitted); see also Silva v. Keyser, 271 F. Supp. 3d 527, 538 (S.D.N.Y. 2017). A state court's factual findings are presumed to be correct unless the petitioner can rebut this presumption by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

### 1. The Petitioner's Brady and Due Process Claims

The petitioner argues that the state post-conviction court improperly applied constitutional law because the government's Brady obligations extend not only to an accused's preparation

56

for trial, but also to his determination of whether or not to plead guilty. The state post-conviction court denied the petitioner's motion to vacate on <u>Brady</u> grounds because Walker's perjury did not exculpate the petitioner. To the extent that Walker's perjury gave reason to discredit Hutchens, the state post-conviction court found that the State was not obligated to disclose Walker's perjury to the petitioner prior to his plea.

The state court relied for this proposition on <u>United States v. Ruiz</u>, 536 U.S. 622 (2002). In <u>Ruiz</u>, the Supreme Court held that a defendant is entitled to information necessary to ensure that his plea was voluntary and that any related waivers of his rights were made knowingly, intelligently, and with sufficient awareness of the relevant circumstances. <u>Id.</u> at 629. However, the Court also unequivocally held that the Constitution does not require the "preguilty plea disclosure of impeachment information." <u>Id.</u> The Court reasoned that impeachment information is related to the fairness of a trial and does not concern whether a plea is voluntary; a defendant's waiver of his rights is "knowing, intelligent, and sufficiently aware if the defendant understands the nature of the right" that he is waiving and "how the right would apply <u>in general</u> in the circumstances—even though the defendant may not know the <u>specific detailed</u> consequences of invoking it." <u>Id.</u> (emphasis in original). Although a defendant may make a more informed choice

as to the consequences he could face with a plea, waiver, or decision if he had knowledge of impeachment information, the "Constitution does not require the prosecutor to share all useful information with the defendant." Id. (citation omitted). The Court of Appeals for the Second Circuit affirmed the dismissal of a habeas petitioner's petition alleging that the prosecution engaged in a Brady violation when the prosecution failed to disclose the use of hypnosis evidence to the petitioner prior to the petitioner's pleading guilty. Friedman, 618 F.3d at 153-54. The Court of Appeals held that evidence of hypnosis was impeachment evidence, rather than exculpatory evidence, and that under Ruiz, a petitioner is not entitled to receive impeachment information prior to pleading guilty. See id.

The Court of Appeals had previously held in United States v. Avellino, 136 F.3d 249 (2d. Cir 1998), a case to which the AEDPA standard of review did not apply, that the Government's Brady obligation was "pertinent not only to an accused's preparation for trial but also to his determination of whether or not to plead guilty." Id. at 255. In Friedman, the Court of Appeals noted in dicta that while Ruiz's holding addressed only impeachment claims and thus did not expressly abrogate the holding in Avellino, Ruiz's holding that the Government was not required to provide impeachment evidence prior to a guilty plea

could be interpreted to mean that the Government was also not required to provide exculpatory evidence under <u>Brady</u> prior to a guilty plea. <u>See</u> 618 F.3d at 154.

> The Supreme Court has consistently treated exculpatory and impeachment evidence in the same way for the purpose of defining the obligation of a prosecutor to provide <u>Brady</u> material prior to trial, and the reasoning underlying <u>Ruiz</u> could support a similar ruling for a prosecutor's obligations prior to a guilty plea.

<u>Id.</u>

The state court properly found that Walker's testimony did not exonerate the petitioner but could have been used as impeachment evidence against Hutchens. Because Walker's testimony constituted impeachment evidence, it fell squarely within the scope of <u>Ruiz</u> and the State was not obligated under the Constitution to turn over the information to the petitioner before his plea. The state court's decision was therefore consistent, and not contrary to, clearly established federal law and was a reasonable application of <u>Ruiz</u> to the petitioner's case. Therefore, a writ of habeas corpus would not issue under Section 2254(d)(1) or 2254(d)(2).

The petitioner also argues that the state post-conviction court erred in denying the petitioner's claim that the <u>ex parte</u> letter the State submitted to the state trial court violated the petitioner's due process rights to an impartial hearing. The

petitioner has cited no Supreme Court precedent for the proposition that the State violated the petitioner's due process rights by submitting an ex parte letter to the trial court and seeking guidance on whether the prosecution was required to turn over material that potentially endangered the life of a former grand jury witness. The petitioner's claim therefore fails to meet Section 2254(d)(1).

The state post-conviction court's decision of the petitioner's due process claim was also not based on an unreasonable determination of the facts under Section 2254(d)(2). The state post-conviction court found that the State did not act improperly in placing the matter before Justice Snyder and that the State believed in good faith that Walker would be placed in danger if the information were shared with the defendants. Moreover, even improper ex parte contact requires a showing of some prejudice in order to overturn a verdict. See Bell v. Coughlin, 778 F. Supp. 164, 170 (S.D.N.Y. 1991) (no basis to disturb trial verdict on the basis of improper ex parte contact, absent some concrete prejudice); Samper v. Greiner, No. 00-CV-1401, 2002 WL 334466, at *8 (S.D.N.Y. Mar. 1, 2002), vacated on other grounds, 74 F. App'x 79 (2d Cir. 2003) (petitioner entitled to habeas relief only if prejudiced by ex parte contact). The petitioner contends that he suffered prejudice from the ex parte letter because Justice

Snyder improperly denied the petitioner's motion to withdraw his plea based on evidence in the ex parte letter. The petitioner alleges that at the sentencing, when Justice Snyder stated that the evidence against the petitioner "both in the Grand Jury minutes and other sources [was] overwhelming," Justice Snyder was referring to and thus improperly relied on the contents of the ex parte letter. It is not clear exactly what sources Justice Snyder was referring to. Nevertheless, even setting aside the ex parte letter, Justice Snyder stated other bases that were sufficient to deny the petitioner's motion to withdraw his plea, such as her conclusion that the petitioner was trying to withdraw his plea as a tactical move to be tried separately from the petitioner's codefendants. Given the threat that an early disclosure of Walker's perjury to the defendants could have posed to Walker, the state post-conviction court properly found that weighing the defendants' rights to material evidence and Walker's safety, the proper time to disclose the evidence was when Hutchens was about to testify at trial. Accordingly, the state post-conviction court's determination that the ex parte letter did not violate the due process rights of the petitioner was not based on an unreasonable determination of the facts in light of the evidence presented at the 440.10 hearing and a writ of habeas corpus would also not issue under Section 2254(d)(2).

61

## 2. The Petitioner's Ineffective Assistance of Counsel Claims

To prevail on a claim of ineffective assistance of counsel under federal law, as determined by the Supreme Court in Strickland v. Washington, a petitioner must show that his counsel's performance was both (1) objectively unreasonable under professional standards prevailing at the time and (2) that counsel's deficient performance prejudiced the petitioner's case. See 466 U.S. 668, 687-88 (1984). When analyzing the performance prong, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. To satisfy the prejudice prong when the petitioner has pleaded guilty, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." See Hill v. Lockhart, 474 U.S. 52, 59 (1985). In guilty plea cases,

> where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

Id.

The state court properly rejected the petitioner's first argument for ineffective assistance of counsel based on the failure to develop expert evidence. Justice Pickholz determined that the petitioner's counsel could not have known about the weakness in the prosecution's theory of the murder when the petitioner pleaded guilty. Rather, this evidence was only apparent after Ortiz testified to his version of the events during trial. Accordingly, the state court found that while it was objectively unreasonable for the attorneys for Green and Dushain to fail to consult with a forensic expert after Ortiz testified, the petitioner had failed to show that his attorney had behaved below prevailing professional standards by not hiring an expert witness prior to the petitioner's guilty plea. See Cosey, 2016 WL 7812677, at *23.

The failure to consult expert testimony regarding the manner of Williams's death before the petitioner pleaded guilty was not objectively unreasonable. The decision to call or not call witnesses is generally a tactical decision. See United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998). As the state post-conviction court found, the petitioner's counsel would not have had reason to know that there was a potential discrepancy between the medical evidence and the prosecution's theory of the case until Ortiz testified at trial. The petitioner's counsel testified at the 440.10 hearing that on the

eve of trial, the petitioner's best arguments were his alibi witnesses, Summers and Bobbitt. Szczepanski Decl. Ex. 9 at 1770. When counsel learned that Bobbitt had become unavailable, he explained that it "took the wind out of [their] sails and it undermined our defense." Id. at 1769. The petitioner's counsel stated that this information played an important part in the decision that the petitioner made to plead guilty. Kress Decl. Ex. Y at 1785. Based on the knowledge available to counsel at the time, it was not unreasonable for the petitioner's counsel to choose not to hire an expert. Given the many factual differences between prosecution and defense versions of the events, there were "any number of hypothetical experts . . . whose insight might possibly have been useful. . . . Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." Harrington v. Richter, 562 U.S. 86, 107 (2011) (citations omitted) (holding that state court could reasonably conclude that counsel's performance was not deficient for failing to consult blood evidence experts, when blood evidence had not been part of prosecution's case prior to trial). "Reliance on the harsh light of hindsight to cast doubt on a trial that took place now more than 15 years ago is precisely what Strickland and AEDPA seek to prevent." Id. (internal quotation marks and citations omitted). Because courts

apply "a heavy measure of deference to counsel's judgments," Strickland, 466 U.S. at 691, the defense counsel's conduct in the case was not objectively unreasonable under professional standards prevailing at the time and the petitioner has failed to establish that the state court unreasonably applied the Strickland standard when it concluded that the petitioner failed to show that his counsel's performance was objectively unreasonable.

The petitioner also argues that his counsel was ineffective for failing to argue that the prosecutor and the trial court pressured Bobbitt to assert a Fifth Amendment privilege and become unavailable as a witness. However, as the state court noted, there was no evidence that the prosecutor or the trial court "ever pressured Bobbit[t] not to testify for the defense." Cosey, 2016 WL 7812677, at *17. Justice Pickholz held that "an attorney is not ineffective for failing to make a motion which has little or no chance of success." Id. The petitioner has failed to show that Justice Pickholz unreasonably determined the facts. Moreover, the petitioner has failed to show that the state court's conclusion is contrary to clearly established law. The Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009); United States v. Kirsh, 54 F.3d 1062, 1071 (2d

Cir. 1995) (holding that counsel's "failure to make a meritless argument does not rise to the level of ineffective assistance"). Accordingly, the petitioner's claim that his trial counsel was ineffective for not arguing that the prosecutor and the trial court pressured Bobbitt to become unavailable also fails the performance prong.

Finally, the petitioner argues that that his counsel was ineffective for failing to support the petitioner's withdrawal of his guilty plea. The petitioner argues that his attorney should not have so meekly acquiesced to the sentencing judge's opinions. Justice Snyder had stated that the petitioner's motion to withdraw his plea was "the most outrageous application I have ever heard." Kress Decl. Ex. B at 84. In her decision to grant a 440.10 hearing, Justice Pickholz found that there was no merit to the argument that an attorney should have raised that the petitioner's initial answers, which contained some slight hesitation, were inadequate, because the initial answers did not suggest that the petitioner "was not truly guilty of the crime." Kress Decl. Ex. N at 23. Furthermore, Justice Pickholz noted that the petitioner's trial lawyer "read all of the materials that his client had prepared and fully presented the claim" in the same way that any competent attorney would have done in similar circumstances. Id. Because the attorney adequately presented the petitioner's request to withdraw his guilty plea,

66

the petitioner has failed to satisfy the deficient performance prong of Strickland.

The petitioner has failed to show that the state court reached a decision that was contrary to, or involved an unreasonable application of, clearly established federal law for all three of his ineffective assistance of counsel claims. He has also failed to show that the state court came to an unreasonable determination of the facts in light of the evidence presented at the 440.10 hearing in reaching its decision. Therefore, pursuant to Section 2254(d), the petitioner's application for a writ of habeas corpus should be denied with respect to his claims of ineffective assistance of counsel.

### 3. The Petitioner's Freestanding Actual Innocence Claim

The state court's adjudication of the petitioner's actual innocence claim unmoored to any independent claim of a constitutional violation also does not support the issuance of a writ. As discussed above, the Supreme Court has never held that a petitioner may bring a freestanding claim of actual innocence in a non-capital case. See e.g., Osborne, 557 U.S. at 71-72. Therefore, the state court's decision rejecting the petitioner's freestanding claim of actual innocence was not "contrary to, [and did not involve] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . ." 28 U.S.C. § 2254(d)(1).

67

It should also be noted that the petitioner has presented no evidence that the state court came to an unreasonable determination of the facts in light of the evidence presented at the 440.10 hearing. The state court rejected the petitioner's claims of actual innocence on the merits. The court correctly found that Walker's perjured testimony did not exculpate the petitioner. The court also concluded that the newly presented forensic evidence did not preclude the State's theory of the case. The court found the testimony from Hutchens, Summers, Bobbitt, and the petitioner not to be credible, and did not consider Ortiz's statements to Wallace. The state court relied heavily on the petitioner's admissions of guilt at his plea allocution. The state court's credibility determinations are presumed to be correct. Under clearly established federal law, the state court did not err in relying on the petitioner's sworn testimony at his plea allocution.

> A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence. Accordingly, when the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary. If the answer is in the affirmative then the conviction and the plea, as a general rule, foreclose the collateral attack.

United States v. Broce, 488 U.S. 563, 569 (1989); see also

Bousley v. United States, 523 U.S. 614, 621 (1998). The

sentencing court's denial of the petitioner's motion to withdraw

his plea was unanimously affirmed by the Appellate Division,

which found that the trial court properly concluded that the

"defendant's challenges to the plea were contradicted by his

plea allocution and that the plea was voluntary." Cosey, 730

N.Y.S.2d 434. Subsequently, leave to appeal to the Court of

Appeals was denied. Therefore, the petitioner has failed to show

that the state court erred in denying his freestanding claim of

actual innocence.

## CONCLUSION

The Court has considered all the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained above, the petition for a writ of habeas corpus is **dismissed.** The Court will issue a certificate of appealability for the Court of Appeals to consider whether the petitioner has satisfied the requirements of 28 U.S.C. § 2244(b)(2)(B) and whether the petitioner has made a sufficient showing to overcome the time bar in 28 U.S.C. § 2244(d)(1). For the reasons explained above, the resolution of these issues involve substantial constitutional issues. The Clerk is directed to enter judgment dismissing the petition. The Clerk is also directed to close this case.

**SO ORDERED.**

**Dated:    New York, New York**
**           May 19, 2020**

                                        /s/ John G. Koeltl
                                   _____
                                        **John G. Koeltl**
                                   **United States District Judge**